FREDERICK A. WAGNER, appellee, v. ELDON LARSON et al.,
appellants.

No. 51660.

(Reported in 136 N.W.2d 312)

1204

June 30, 1965.

Kindig, Beebe, McCluhan & Rawlings, of Sioux City, for Eldon Larson, appellant.

Shull, Marshall, Mayne, Marks & Vizintos, of Sioux City, for Lundell Manufacturing Company, Inc., appellant.

1206

John Paul Jones and W. C. Hoffmann, of Des Moines, and Joe G. Nelson, of Cherokee, all for New Holland Machine Company, Inc. and Sperry Rand Corporation, appellants.

Miller, Miller & Miller, of Cherokee, for appellee.

SNELL, J.—This is an appeal from a judgment for plaintiff against three separate defendants arising from injuries received while operating a silo unloader. Plaintiff is a farmhand. He sued the farmer by whom he was employed (Larson), the distributor of the silo unloader (Lundell), and the successor in interest to the manufacturer (Sperry Rand Corporation).

Plaintiff's action against his employer was based on alleged negligence in failing to provide safe machinery and a safe place to work. In separate divisions plaintiff's action against Lundell and Sperry Rand was based on negligence and breach of implied warranty. The case was tried to a jury. The jury returned a verdict against all defendants.

As plaintiff's claims against the respective defendants do not proceed from the same premise they will be separately considered.

Division I of plaintiff's petition is directed against Eldon Larson.

Defendant Larson, plaintiff's employer, is a farmer and extensive cattle feeder. He had two silos equipped with silo unloaders. They were self-propelled machines as distinguished from suspended type machines. The machine rests on the silage as it moves around, picking up the silage as it makes a forward motion. Each machine had a guide wheel to keep the unloader centered in the silo, a leveling device, dual drive wheels, depth adjustments, dual chippers to remove frozen silage from the silo wall, and dual augers to deliver silage to the thrower. Each auger was equipped with steel cutting knives to remove hard packed or frozen silage.

When in operation the machine revolved slowly over the packed silage cutting and augering the silage for delivery to the down chute. The moving parts were not shielded. The power was controlled by an outside electric switch at the bottom of the

silo. There was also a disconnect plug on the center pole of the machine.

Pictures of the machine were received in evidence. The following is a reduced in size reproduction of plaintiff's Exhibit 4:

The two silo unloaders had been owned and operated on the Larson farm since prior to plaintiff's employment. They were in the same condition as when purchased and had no broken parts. Except as noted, infra, they operated satisfactorily.

Plaintiff was employed as a farmhand by defendant Larson in August 1960. This employment continued until January 20, 1962. Incident to his job he worked with the silo unloader involved herein and was familiar with its construction and operation. Most of the time Mr. Larson would work with plaintiff.

At times the unloader would get stuck in the silage. The augers and cutting parts would keep turning but would not move forward so as to revolve over the silage. When this happened the machine would dig itself into a hole. This might happen when the silage was loose but usually happened when frozen silage accumulated on the silo wall.

When this happened one of the men, sometimes Mr. Larson and sometimes plaintiff, would climb up the chute and into the silo. The other man would shut off the power from below. The reason for shutting off the power while a man was in the chute "was to keep what little silage that was coming down from getting down your neck." The man on the ground served no other purpose. When the man inside was ready he would yell and the power would be turned on. With the power on and the various parts turning the man inside would rock the machine from the front and from the rear until it was loosened and moving. Plaintiff was familiar with and had followed this procedure during the time of his employment. Plaintiff's knowledge of and familiarity with the machine was from observation and experience and not from specific instruction.

He testified that he did not consider it dangerous to be in front of the machine or that either the machine or the silo was dangerous.

On January 20, 1962, plaintiff was working alone. Mr. Larson was at home recovering from surgery. The temperature was 27 degrees below zero. Plaintiff started the silo unloader by turning on the switch at the bottom of the silo. Silage started coming down the chute. After a short period of time plaintiff "could hear that it had quit throwing down silage, so the next

thing was to go up and get it going again." The same thing had happened twice the day before and plaintiff had been in the silo then. He knew the conditions in the silo. Plaintiff then testified:

"A. Well, I climbed up to the silo, climbed in the door, and just like always I started to pull on the front guide wheel, I believe they are calling it, with no results. So I walked around behind and tried to lift and push there and I didn't have any luck there. So I came back around to the front and I again tried the wheel and nothing happened. So then I went up to where we always did before and tried to lift and pull there. * * *

"Q. Now going on from the point where you took hold of this rod, tell us everything you remember from that point on? A. Well, from that point on my memory isn't very good. The next thing I remember was being caught. * * *

"A. Well, it of course was trying to pull your whole body into the machine, and at the same time trying to pull it towards the center. And someway or the other, after a time, I got out of the machine and proceeded to climb down out of the silo and get help."

Plaintiff was standing on frozen silage, where the machine "would move if it came loose." He was pulling on a rod in front of the machine. He does not know just what happened but he slipped and fell on his back. His feet went into the moving parts of the machine. His left foot was severed and his right foot injured. He testified that just before the accident he was holding a fixed rod which does not revolve or turn or have any motion whatever.

I. Plaintiff's claim against defendant Larson is based on and was submitted to the jury on specifications of negligence. The jury was properly instructed that contributory negligence of plaintiff should be considered only in mitigation of damage and that the burden of proving assumption of risk was on defendant.

If supported by substantial evidence the findings of fact by the jury are binding on us and we give plaintiff's evidence the most favorable construction it will reasonably bear. Citations unnecessary. See rule 344(f)1 and 2, Rules of Civil Procedure.

The trial court's Instruction No. 22 stated the employer's duty to his employee as follows:

"The law provides that an employer must use reasonable care to provide and maintain for his employees, reasonably suitable and safe appliances, machinery and tools with which to work.

"The employer is not required to provide appliances, machinery and tools which are absolutely safe, nor required to maintain the same in such condition that an accident to the employee could not happen. The employer is not an insurer of the employee's safety, but must exercise the degree of care which a person of ordinary care and prudence would use under all the circumstances and conditions to provide appliances, machinery and tools which are reasonably safe.

"If you find from a preponderance of the evidence that the defendant Eldon Larson failed to use reasonable care to provide his employees with reasonably safe appliances, machinery and tools with which to work, as herein defined, then such failure would constitute negligence on his part."

The correctness of this instruction has not been challenged. Within this definition the court submitted five specifications of negligence charged against defendant Larson. The court told the jury that proof of any of the charges would establish negligence.

II. The first specification was as follows:

"(a) In requiring plaintiff to operate a silo unloader which was defective and which defendant knew, or should have known, was defective, and that said silo unloader was defective for want of safety devices and by reason of unsafe design."

The substance of this charge is that defendant Larson knew or should have known the machine was defective for want of safety devices and unsafe design.

There is no evidence in the record that the unloader at the time of the accident had any worn, broken or defective parts. There is no evidence that Mr. Larson knew anything about silo unloaders except the two he owned. There is nothing to show that he knew anything about safety devices or design of machinery. This specification does not go to the duty of an em-

ployer to keep machinery in repair or to warn or guard against latent defects. It goes directly to the responsibility of a farm employer for the safe design of the machinery on his farm.

In his petition plaintiff attempted to particularize this specification by reference to design defects alleged in subsequent paragraphs but its substance as pleaded and submitted related solely to the liability of the employer for design by the manufacturer.

III. Section 88.14, Code of Iowa, providing that an employee shall not be deemed to have assumed the risk incident to using defective or out of repair machinery, under certain circumstances, does not make an employer liable for the design of machinery under the circumstances shown in this case. Except as plaintiff charges a dangerous design there is no showing that the machine was defective or out of repair. Plaintiff was familiar with the machine and its operation was incident to his job. The cited statute provides that it does not cover such risks as are incident to the employment.

IV. The alleged defect in the machine was not latent. Its construction was open, obvious and its operation as well known to plaintiff as to defendant Larson. The evidence does not establish that defendant Larson even knew of any available improvements to reduce danger.

■ Farm implements have become and are constantly becoming larger, more complicated and powerful. Resultantly, they have become more dangerous. A farm employer is not an insurer of the safety of his employee and until we have a law such as Workmen's Compensation applicable to farm employment there is no absolute liability. There may be liability but if so it is not based on the farmer's responsibility for the manufacturer's design. Mr. Larson had no such connection with design as to make anything he did or failed to do the proximate cause of the accident. Cases wherein liability has been recognized are considered in subsequent divisions.

V. Plaintiff's second charge of negligence against defendant Larson alleged that he required plaintiff to operate the unloader in an unsafe and dangerous condition. The alleged dangerous conditions were particularized but each related to

some item of design. The charges were (1) no adequate shields over and around the augers; (2) not proper traction on the power wheels; (3) not equipped with a center cable and outside winch for raising the machine by outside controls; (4) no cutoff switch at the far end of the augers; (5) an unshielded square drive shaft to the power wheels.

The machine did not come equipped with shields. Some time after delivery of the machine to defendant Larson the manufacturer sent to the dealer shields to be applied over the top of the auger. None was ever delivered to Larson and there is no evidence that he ever knew such shields were available. If we accept plaintiff's testimony such shields would not have prevented his injury. He said he was not standing on the machine but got into the augers from in front. Failure to shield the top could not be the proximate cause of injury from the front.

Traction on the power wheels also was a matter of design not chargeable to defendant Larson. The machine apparently worked satisfactorily except when ice on the silo wall tilted the machine out of level. This claim of plaintiff might relate to the efficiency of the machine but we are not prepared to say that a farmer may be found negligent just because he owns a machine that gets stuck under adverse conditions.

The evidence indicated that there are two distinct types of unloaders. The type involved here rests on the silage and is controlled by inside machinery turned on and off through an outside switch. The other type is suspended from a center cable from the top of the silo and is raised and lowered by an outside winch. Plaintiff's claim is that the machine involved here is the more dangerous kind. Plaintiff's claim in this particular would make a farm operator negligent for buying a type or make of machinery if it should later appear that safer types were available. While a purchaser might be negligent in knowingly buying and using unnecessarily dangerous equipment we cannot go so far as to say that there was any showing of negligence in the case at bar.

The claim against defendant Larson is based on negligence and not warranty. It is not a case of absolute liability with the limitations of Workmen's Compensation. Plaintiff seeks to hold

his employer negligent in failing to exercise the judgment that might be expected of a mechanical or safety engineer. This would go far beyond anything we have said or are willing to hold.

The outside location of the power switch and the disconnect plug on the center pole were matters of design. Unless we are to hold, which we are not willing to do, that it was the duty of the purchaser to redesign and relocate the component parts of the machine these are not items chargeable to Larson.

The drive shaft to the power wheels was square and unshielded. What we have said, supra, applies here. Also the shaft revolved slowly, plaintiff was aware of it while working and does not claim that he came in contact therewith. There is no showing whatsoever that the slowly revolving square shaft was a proximate cause attributable to any act or failure to act of defendant Larson.

VI. Plaintiff's third charge of negligence against the defendant Larson was in requiring plaintiff to operate the unloader alone when the defendant knew or should have known that it could not be operated without additional assistance. This charge of negligence is not supported by the record. The plaintiff testified that even when two men were present only one entered the silo. The only duty of the second man was to stay outside and turn the power on and off while the other was climbing or descending the chute. The plaintiff testified that the purpose of turning the power off was so that the man in the chute would not get silage down his neck. There is not the slightest evidence that the presence of another man would have prevented the accident or that the fact that plaintiff was working alone was in anyway a proximate cause of his injury.

VII. Plaintiff's fourth charge of negligence against the defendant Larson was in requiring plaintiff to work outside in temperatures of 27 degrees below zero. We cannot approve the submission of such a specification of negligence involving farm work in Iowa. Iowa is a state where temperatures vary greatly and range from very high to very low. There is no evidence that the plaintiff was unaware of or complained about the cold or objected in anyway to the performance of his necessary duties

because of discomforts incident to the weather. Even when the temperature is very cold and the weather is very bad livestock must be fed. Farm operators and farm employees know this and neither has any control over the weather or the weather conditions under which the work must be done. It is not proper to submit to a jury a charge of negligence against a farm operator based on the fact that an employee goes about his necessary chores when the weather is cold.

VIII. The fifth charge of negligence against the defendant Larson was in failing to install available safety guards on the unloader. There is no evidence that the defendant Larson knew of any available safety guards nor any evidence from which it could be concluded that he should have known of safety devices.

There is nothing in the record on which to base a charge of negligence against the defendant Larson and nothing in the record to bring this case within our pronouncements in the field of farm accidents.

IX. We have recently had farm accident cases before us. Our most recent pronouncements appear in Calkins v. Sandven, 256 Iowa 682, 129 N.W.2d 1; Frederick v. Goff, 251 Iowa 290, 100 N.W.2d 624; and Mooney v. Nagel, 251 Iowa 1052, 103 N.W.2d 76. An analysis of these cases indicates entirely different situations from those we have in the case at bar. In Sandven the injured plaintiff-employee was operating the machinery on the wagon for the first time. He had never used it before nor had he paid any attention to its operation. In the case before us the plaintiff was thoroughly experienced in the operation of the machine. In the case before us the plaintiff was pulling the machine toward himself when he slipped. In Sandven the plaintiff did not fall as a result of any contact with the machine. He slipped from outside causes and fell into the unguarded machine. In Sandven the defendant was more familiar with the machine than was the plaintiff who was without experience. Such is not the case here. In Sandven we held that a false impression of safety was created by the partial shielding and that it would have been feasible and relatively simple to shield that part of the machinery into which the plaintiff fell. In the case at bar there

was no false impression and no showing that it would have been relatively simple for the defendant Larson to have shielded that part of the machine into which plaintiff fell. In Sandven the moving parts causing plaintiff's injury were not readily observable. There was a latent danger with a duty to warn. Such is not the case here. In Sandven we suggested that the machine was more dangerous because of partial shielding than it would have been without shields.

In Frederick the plaintiff was directed by the defendant to hurry in the use of equipment that was worn, defective, frequently coming apart because of wear, and not suitable for the work and such facts were known to the defendant. Such is not the factual situation in the case at bar.

In Mooney, a four to three decision with two judges not sitting, plaintiff was injured in a corn sheller. A shield that was an integral part of the machine had been missing for two weeks. Defendant knew of the condition but told plaintiff to keep the machine running and to wrap a grain sack around a pipe to take the place of the missing shield. While doing so his hand was caught in the gears at the end of the auger and injured. Plaintiff was following specific directions of defendant in coping with a machine with a missing part. Such is not the case here.

X. Defendant Larson moved for a directed verdict. The motion should have been sustained. Plaintiff's case against Larson was based solely on negligence. There was no evidence of negligence on the part of defendant Larson to support a judgment against him.

XI. Plaintiff's Divisions II and IIA are directed against the manufacturer of the silo unloader and its successor in interest.

Plaintiff's Division III is directed against Lundell Manufacturing Company, Inc., the dealer who sold the machine in the retail trade. These divisions were based on allegations of negligence.

Division IV of plaintiff's petition realleged the previous allegations and charged concurring negligence against all defendants.

Division V of plaintiff's petition is directed against the

manufacturer and the dealer and is based on alleged breach of implied warranties.

The silo unloader involved was manufactured by the Farmway Company of Manawa, Wisconsin. The Farmway Company was acquired by New Holland Machine Company, a division of Sperry. Rand Corporation. Sperry Rand Corporation, as successor in interest, defends as the manufacturer. The silo unloader involved was sold under the name of Lundell or Lundell Silo Queen Unloader.

XII. Plaintiff's claim against the manufacturer was submitted to the jury on both theories of negligence and implied warranty. We summarize in the light most favorable to plaintiff the evidence in support thereof.

Relative to his accident plaintiff testified as to his farm background. He had worked for defendant Larson from August 1960 until his accident on January 20, 1962. His duties included general farm work, chores, feeding livestock and getting silage from the silos to the livestock. He worked with the silo unloaders. At times when the silo was first filled and the silage was loose or when the silage was frozen the machine would get stuck by digging itself into a hole. To get it out he (or Mr. Larson) would lift and pull with the power on. He said, "You can't get this machine out without the power. * * * I know of no way possible to get it going again without the power being on." He stated what he did just before his injury as set forth, supra. He said the machine had no broken parts or defects in any of its parts. He did not know how he got into the machine but it was not from the top. In a subsequent division we will discuss that part of his cross-examination relating to impeachment.

Plaintiff called as an expert witness in his behalf Professor W. F. Weiland, Emeritus Professor of Mechanical Engineering at the University of Nebraska. He had many professional degrees and honors and extensive experience in the field of Mechanical Engineering, but not in the field of Agricultural Engineering. He did not know the percentage of silo unloaders of the suspended type as distinguished from the self-supported type. He did not know the percentage of unloaders with shielding on the forward or afterside of the augers and had never seen

a suspended type unloader in operation. Neither had he seen the Lundell machine in operation. The professor testified at length relative to safety features and safety design. He testified that in his opinion the Lundell machine is a very dangerous machine. He said the machine did not comply with the precautions and codes for safe operation of machines set down by The National Safety Council, The American Standard Association, The American Society of Mechanical Engineers, and others. He identified several features he considered dangerous and not in compliance with "American Standard Safety Code for Conveyors", published by the American Society of Mechanical Engineers from which he was testifying. A copy of these various standards was received in evidence. He stated that he had examined photos and brochures of other makes of unloaders. They were machines sold by defendants' competitors. They were of different design and were the center cable suspension type. He said other machines were safer to operate, that the others "are only relatively safe comparatively speaking", and that he "would put the Lundell loader way down at the bottom of the list." In response to a question as to obvious danger he replied: "It would be very obvious to me, but I doubt whether it would be obvious to you, for example, or to an ordinary operator. I am sure it wouldn't."

The professor's testimony throughout related to design and not to defects in construction.

A salesman for competing lines of unloaders identified the pictures from which Professor Weiland testified. He also testified that he had helped get Lundell unloaders loose when stuck by using methods comparable to plaintiff's. He testified that the various silo unloaders sold by him were more efficient, safer and less inclined to get stuck than was the Lundell machine. He also testified that a representative of the manufacturer had told him they were no longer making an unloader; that they were coming out with a suspended model. All this was over the objections of counsel.

A farmer living in the territory testified that he bought a Lundell unloader in 1959. He had trouble with it after the silo was filled with grass silage. There were no problems until loose hay was in the silo. He complained to Mr. Lundell that someone

would get hurt trying to get the machine started. He returned the machine to the dealer.

Another farmer who owned a Lundell unloader similar to defendant Larson's testified that his did not function properly, got stuck and could only be started by pulling from in front with the power on.

Another farmer with a similar machine testified that he had been injured by getting in the machine from the top. He thought it was his own fault.

A former service manager for defendant Lundell testified as to complaints from customers; that the machines got stuck and that he would help by pulling from in front. In his opinion it was "necessary that the machine be running to get itself out of the hole." He testified that shields for the top were made available sometime in 1961. This witness was then asked:

"Q. While you were there and servicing these machines, the Lundell Silo Queen, do you know whether or not the company had a problem with reference to the sale of these machines in the State of Minnesota?" After several objections he answered: "A. We had a salesman in Minnesota and I asked him at one time why he wasn't—why I wasn't called into Minnesota in his territory to install silo unloaders."

He was then asked whether he made the information available to Mr. Lundell. He answered: "I can't remember whether I did or did not. Probably I did, but I couldn't say for sure."

He was asked: "Do you know whether Mr. Lundell was aware of the situation in Minnesota?" He answered "Yes."

"Q. And what was the situation up there? A. That we couldn't install unloaders up there because of the open augers.

"Q. Was that because of some ruling of some agency of the State of Minnesota?"

All this was over the vigorous objections of defendants.

Objections that the next questions were leading were sustained.

Counsel for plaintiff then addressed counsel for defendant Lundell as follows:

"Mr. Miller: Very well. I will ask you, Mr. Mayne, will you produce for me, from the files of the Lundell Manufacturing

Company the correspondence between the Lundell Manufacturing Company and the Safety Commission Department of the State of Minnesota?"

Objections and an argument between counsel followed. The matter was not pursued further at that time.

Defendants' motions for mistrial were overruled and the trial was continued without prejudice to defendants' urging of the motion.

Under a subpoena duces tecum and over the objections of defendants, correspondence between defendant Lundell and an agency of the State of Minnesota was made available to plaintiff's counsel.

A salesman for a competitive machine (a suspension type) compared his machine with the Lundell machine and testified that in his opinion the Lundell machine was not safe. He also testified from his experience (limited to one time) unless there were three or four men to lift, the Lundell machine when stuck could not be started unless the power was on.

Plaintiff read into the record the discovery deposition of defendant Lundell over the objections of defendants based on a dispute among counsel as to the conditions under which it was taken. Except for the reference to his contract with the manufacturer and the advertising brochures referred to, infra, we do not consider the contents of the deposition determinative of the issues before us.

We need not detail the evidence offered by defendants in order to consider the issues before us. It consisted of testimony by defendants Larson, Lundell, an engineer for the manufacturer, servicemen and farmers who owned Lundell machines. The testimony refuted plaintiff's claims as to the relative dangers between types of machines. The testimony was to the effect that when the machine was stuck the remedy was by adjusting the guide wheels and that the safety standards referred to by plaintiff's engineer referred to industrial but not agricultural machinery. These disputed questions presented issues for the jury. The probative value of the evidence was for the jury. State Farm Mutual Automobile Insurance Co. v. Anderson-

Weber, Inc., and Ford Motor Co., 252 Iowa 1289, 1293, 110 N.W. 2d 449.

XIII. The first problem to be considered before discussion of alleged errors in procedure and the admission of evidence is the basic liability of the manufacturer in the field of products liability.

Senior U. S. District Judge Henry N. Graven in analyzing the law generally and the Iowa cases in particular has said:

"One of the most rapidly expanding fields of litigation has been that of products liability. The law relating to products liability is vast and complex. The law in that field is in a state of change and in many situations it is unclear and unsettled. * * * In many jurisdictions, including Iowa, the appellate courts have not passed upon or considered many of the questions and problems involved and the decisions in other jurisdictions are conflicting."

Judge Graven was speaking to Iowa Judges' Conference. We are in complete accord with that statement but are led to some persuasive authority and reasoning.

In 14 Drake Law Review 117 there appears an article entitled "Manufacturer's Liability For Negligent Design." We quote:

"In approaching any product-design case, it must be borne in mind that there is a very significant difference between liability for negligent *construction* and liability for negligent *design*. 'Design' refers to the plan or concept of a product, whereas 'construction' pertains to the execution of that plan.

"Although they are increasing yearly, decisions on a manufacturer's liability for negligent design are still relatively infrequent. In the very nature of things a product-caused injury is more likely to be traceable to some defect in the manner of construction or in the materials used than to a deficiency in the design. Even when the injury can be traced to some aspect of the product's design, an oft-times insurmountable problem still exists: that of proving there was *negligence* in the design."

In the case before us there is neither claim nor evidence of negligent construction. The whole case is bottomed on alleged

improper design. Resultantly, the many cases involving negligent construction are of little help.

XIV. Confusion has existed as to whether a products liability case should be pleaded in and governed by the law of tort or contract. Because of our recent pronouncements we think the distinction is no longer very real as long as the plaintiff is in the distributive or consumer chain. Breach of warranty is an action founded in contract. Privity is ordinarily an essential element of proof in contract actions but the rule has been relaxed in warranty. See "Warranty and Negligence Distinguished", section 16.01, Frumer and Friedman, Products Liability.

In State Farm Mutual Automobile Insurance Co. v. Anderson-Weber, Inc., supra, loc. cit. 1301, we said:

"In Iowa the old rule of nonliability for negligence of a manufacturer of goods except to one in privity of contract has been repudiated. See discussion in Thompson v. Burke Engineering Sales Co., 252 Iowa 146, 153, 106 N.W.2d 351, 356, and citations.

"The same reasoning applies in warranty as in negligence cases."

In Hahn v. Ford Motor Co., 256 Iowa 27, 33, 126 N.W.2d 350, 354, we said:

"Without intending to indicate in anyway the extent to which the implied warranty theory will be applied to persons in the distributive chain beyond the facts of the Anderson-Weber case, we hold that there is no implied warranty of fitness from the manufacturer or dealer to members of the general public."

This holding does not prevent recovery by plaintiff in the case at bar.

An employee of the purchaser of a machine is a person naturally expected to use the machine and is within the distributive or consumer chain and is not outside the perimeter of the manufacturer's liability. Restatement of the Law of Torts, section 388; 76 A. L. R.2d 91, 98. Frumer and Friedman, Products Liability, section 16.03(7), citing Peterson v. Lamb Rubber Co., 54 Cal.2d 339, 5 Cal. Rptr. 863, 353 P.2d 575. Section 2-318, Uniform Commercial Code.

XV. The authorities discussing the responsibility of a manufacturer for injury resulting from design are analyzed and considered in the leading cases of Campo v. Scofield, 301 N. Y. 468, 95 N.E.2d 802, decided in 1950, and Murphy v. Cory Pump and Supply Co., 47 Ill. App.2d 382, 197 N.E.2d 849, decided by appellate court of Illinois in 1964.

In Campo plaintiff was injured when his hand was caught in revolving steel rollers of an onion topping machine. Plaintiff claimed negligence of the manufacturer in failing to equip the machine with a guard or stopping device. The court held that because there was no claim of privity the complaint could not be sustained on any theory of implied warranty. In Division XIV, supra, we have said that this theory has been discarded in Iowa. In the field of negligence the court then said:

"* * * entirely lacking is any allegation of fact indicating that defendants foresaw or should reasonably have foreseen a danger to one using the machine for its intended purpose. As we have observed, those omissions are fatal.

"If a manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any latent defect, and if its functioning creates no danger or peril that is not known to the user, then the manufacturer has satisfied the law's demands. We have not yet reached the state where a manufacturer is under the duty of making a machine accident proof or foolproof."

In the case at bar there was testimony from which the jury could have concluded that the machine did not comply with recognized safety standards which should have been followed by the manufacturer; that the danger should have been foreseen; and that the only way to make the machine operate was the method followed by plaintiff. Professor Weiland also testified that in his opinion the dangers were not obvious. It is not for us to pass on the persuasiveness of this testimony.

In Murphy a child was injured when she fell and came in contact with the rotary blade of a heavy-duty power lawn mower. Plaintiff alleged that the mower was inherently dangerous in design because it had no guard in front. The brochure attached to the mower said in part:

" 'CAUTION LIST FOR POWER MOWER SAFETY AND OPERATION.'

" 'When starting, stand firmly. Always keep your feet away from the blade. Learn to disengage the clutch or to stop the motor quickly. Stop the motor whenever you leave the mower. Don't let children or pets play around the mower while operating. Be sure of balance on inclines. Clear the lawn of debris. Never overspeed the blade; leave the governor alone. When you want to work on the mower, disconnect the spark plug.' "

The court extensively analyzed the authorities and held the manufacturer not liable. We think, however, there is a significant difference in the case at bar. In Murphy there was a clear warning that was ignored. We have no such situation. There is no evidence of warning of danger in starting a stuck machine. There was evidence of failure to function under conditions that should have been anticipated and evidence as to the only way to get the machine started.

Under the evidence in the case before us we think the modern and proper rule is stated in Restatement of the Law of Torts, section 398, as follows:

"A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel lawfully or to be in the vicinity of its probable use for bodily harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."

See also extensive annotation on manufacturer's or seller's duty as to design in 76 A. L. R.2d 91.

Under this rule and the evidence a jury could find that the manufacturer failed to follow recognized standards of care as to safety. There was a jury question on this issue.

XVI. Defendant Lundell, the dealer, defended separately and attempted to limit his liability to that of an ordinary dealer.

In Frumer and Friedman, Products Liability, section 18.04, it is said:

"Design negligence is particularly an area in which it seems difficult ordinarily to find any logical basis for imposing liability upon the retailer in negligence, because design certainly in most instances involves questions of specialized knowledge which the

retailer cannot be expected to have. Of course, there can be instances where the design is so obviously hazardous that this should be apparent to the retailer. Or, the retailer, for example, by reason of demonstrating the product, may discover that the design is hazardous. * * *

"Of course, the retailer may be held liable for design negligence, where the design is one devised by him or represented by him to be proper for a particular type of use."

The distinction between a manufacturer and a dealer ordinarily available to the dealer will not protect defendant Lundell in the case at bar.

Lundell Manufacturing Company makes and distributes farm equipment but has never manufactured silo unloaders. In December 1958 Lundell entered into a contract with the Farmway Company to obtain silo unloaders for resale. Lundell agreed to purchase its entire requirements of unloaders from Farmway for resale in an unlimited territory.

The contract provided that "as to any changes and specifications of the Silo Unloader supplied to Lundell hereunder, the approval of the Engineering Department of Lundell must first be had and obtained in writing before any such changed Farmway equipment shall be supplied to Lundell on any of its purchase orders."

Under this contract Lundell's approval of the design was implicit. The contract also provided for the use of Lundell's serial number plates, decals and paint specifications. The machines as manufactured and sold bore the name "Lundell." Brochures lauding the features of the "Lundell Silo Unloader" advertised the machine. Among the claims this appeared: "Lundell Silo Unloaders have been rigidly tested under the most extreme conditions—including sub-zero weather. The fine accurate machining of all parts assure smooth trouble free operation."

By contract, approval of design, sales methods and advertising and identification procedure, Lundell Manufacturing Company placed itself in the position of the manufacturer.

There was evidence of the purchaser's reliance on the vendor when the machine was purchased. There was also some evidence as to complaints about danger to Lundell.

The 1948 Supplement to Restatement of the Law of Torts, section 401, says:

"A vendor of a chattel manufactured by a third person who has reason to know that the chattel is, or is likely to be, dangerous when used by a person to whom it is delivered or for whose use it is supplied, or to others whom the vendor should expect to share in, or be in the vicinity of its use, is subject to liability for bodily harm caused thereby to them."

XVII. There was evidence from which the jury could have found contributory negligence but we cannot say that it appeared as a matter of law. Questions of contributory negligence and proximate cause are ordinarily for the jury and it is only in exceptional cases that they may be decided as matters of law. Rule 344(f)10, Rules of Civil Procedure.

XVIII. Defendants argue that plaintiff assumed the risk.

Assumption of risk is an affirmative defense. We cannot say that it appears here as a matter of law.

XIX. Some prejudicial errors occurred during the trial.

Before the trial began plaintiff filed a "Motion in Limine." The first part of the motion was as follows:

"Comes now the plaintiff and before trial and before the selection of the jury, moves the Court in limine to instruct the defendants and all of their counsel as set forth below on the following grounds:

"1.

"Since it is immaterial to this suit whether or not;

"a. This plaintiff was ever convicted of any crimes;

"b. Plaintiff has received any Social Security, Veterans, or other pensions;

"c. Plaintiff has ever had any marital difficulties; the defendants are precluded from using any pleading, testimony, remarks, questions or arguments which might inform the jury of such facts."

Such a motion is a useful tool in preventing immaterial matter from encumbering the record. It gives the court an opportunity to rule in advance on the admissibility of evidence.

The motion was sustained.

On direct examination plaintiff testified that he was married and had three children. On cross-examination he was questioned and answered as follows:

"Q. Mr. Wagner, you testified that you have three children. Do you have more than that? A. No, sir.

"Q. That is all the children you have? A. Yes, sir."

At this point counsel for plaintiff asked for a conference in chambers. In chambers plaintiff's counsel asked for admonition of counsel in re Motion in Limine as in violation of the court's ruling thereon. The motion was sustained and defendants' counsel were admonished not to ask any questions in connection with the birth or existence of another child.

Defendants offered to prove by the discovery deposition of plaintiff that he had admitted a previous marriage and a child by that marriage. Defendants asked permission to impeach the testimony of plaintiff by his own deposition. The offer and request were refused.

[16] A trial court has considerable discretion in limiting cross-examination especially when as here the matter sought to be inquired of is not material to the main issues in the case.

Plaintiff having opened the subject defendants were unduly restricted in cross-examination relative thereto. Plaintiff admitted a previous conviction of a felony. The court instructed on impeachment. The restriction on cross-examination curtailed defendants' attempted impeachment. However, the number of plaintiff's children was so immaterial to the issue of how he was hurt that the restriction was not so serious as to require reversal.

XX. As set forth in Division XII, supra, plaintiff's counsel inquired about sales in Minnesota; and brought out by testimony that was clearly hearsay that the Lundell machine could not be sold there. Plaintiff then attempted to show by questions that were leading and calling for hearsay that it was because of an administrative ruling of some agency of the State of Minnesota. Defendants' objections were sustained. Plaintiff's counsel then across the table and in the presence of the jury asked defendants' counsel for the correspondence between Lundell and the Safety Commission Department of the State of Minnesota. In chambers the correspondence was made available

to counsel. It was never used and there is no showing as to contents. There was nothing further to show why the machines could not be sold in Minnesota. There was no showing of causal connection between the ruling of a Minnesota agency and plaintiff's injury.

No evidence relative thereto was ever admitted and plaintiff's procedure was improper.

The applicable law was the law of Iowa and not the regulations of an administrative agency of Minnesota.

We have held in Division XVI, supra, that Lundell was in the position of a manufacturer. The question of notice sometimes necessary to bring a dealer into the picture was unnecessary. All plaintiff's procedure did was create a suspicion or inference nowhere supported by the record.

That the machine was dangerous was admitted. The issue was whether it was unnecessarily dangerous and the causal relation to plaintiff's injury. Plaintiff did not get into the machine from the top. Shields over the top of the augers would not have prevented plaintiff's injury.

The demand of counsel in the presence of the jury for the production of documents not received in evidence and nowhere shown to be relevant to the issues inevitably created an impression that defendants were trying to conceal something of importance. The procedure was improper and prejudicial.

We also note that the entire donnybrook developed after the injection into the record of hearsay.

XXI. We think the applicability to farm machinery of the standards relied on by plaintiff's witnesses was a question for the jury and might well have been covered by a specific instruction. It is proper to show that a machine fails to comply with recognized standards of care as to manufacture or design. In this case, however, the witnesses were permitted to go far beyond the rule and engage in some competitive selling of various types and makes of unloaders. The test is compliance with recognized standards and due care and not which type is preferable or which make is best or worst.

Professor Weiland had never seen the various types of machines in operation and did not know what percentage of

different types were manufactured, but was permitted to look at pictures and brochures of competitive types and say that he would put the Lundell loader "way down at the bottom of the list". Other uncontradicted testimony was to the effect that 30 to 40 percent of unloaders used were self-propelled. The Lundell machine was not compared with similar types.

Salesmen for competitive suspension type machines testified as to the relative advantages of their machines and that their machines were better. The comparisons were not with recognized standards nor with other makes of the same type.

We think it was error to permit the jury to base a finding on comparison of features between competitive types of machines.

The rule was succinctly stated by the trial court in Moran v. Pittsburgh-Des Moines Steel Co., 86 F. Supp. 255, 266, as follows:

"Evidence as to whether or not a given instrumentality is safer or better than the one that has been used, in my judgment, is not proper to be considered as to whether or not negligence exists, unless it is first established that a custom or a usage exists that a certain or given instrumentality is safer or better than another condition or instrumentality."

See also Chicago Great Western Ry. Co. v. McDonough, 161 F. 657.

With 30 to 40 percent of unloaders made being of the self-propelled type no custom or usage was established by comparison with suspended types.

XXII. The witnesses were agreed that silo unloaders with their moving parts and cutting augers are inherently dangerous. No one testified that they can be made completely safe. The issue was whether the particular machine was unnecessarily dangerous when tested by recognized standards and whether plaintiff's injury was caused by a defect that with the reasonable care applicable to manufacturers of dangerous machinery could have been avoided.

Within this perimeter there were two matters that might be found to have a causal connection with plaintiff's injury.

Plaintiff was injured when the unloader stuck and would

not move forward. The machine had a tendency to get stuck. It was defendants' duty to avoid a preventable hazard.

On the outside of the dual power wheels there appears a metal sprocket wheel with metal lugs to dig into the silage and improve the traction. When the machine was so equipped traction was improved. The sprocket wheel was optional equipment not on the machine when plaintiff was hurt. One was installed the next day by Lundell. They had been available for some time but Larson, the owner of the machine, had never been so advised either when he bought the machine or later. The failure to equip the machine with a simple device to prevent the development of a dangerous condition and the failure to advise the owner of such available equipment might have been a proximate cause of plaintiff's injury. A jury question was presented.

There was a dispute in the evidence as to what action was necessary when the machine was stuck. Plaintiff's witnesses said the only way to get the machine started was by pulling and lifting the way plaintiff did. Defendants' witnesses testified that there was an adjustment for the gauge wheels that would have prevented the trouble. There was no evidence that either plaintiff or Larson had ever been advised relative thereto. If some special information was essential to the safe operation of the machine it was the duty of the manufacturer and dealer to warn or advise.

XXIII. Professor Weiland testified as to the danger incident to a slowly rotating square drive shaft. There was no evidence whatsoever that plaintiff ever had any contact with the drive shaft or that the drive shaft had anything to do with plaintiff's accident. Plaintiff testified that he had been pulling and lifting on the bar in front of the machine.

Professor Weiland testified as to the danger incident to lack of shields over the top of the augers. Plaintiff said he did not get into the top of the augers. The Professor testified as to lack of shields on the back side. Plaintiff was in front of the machine.

The Professor testified as to the lack of overload devices to shut off the power by shear pins or slip couplings. There was nothing to connect such deficiency with plaintiff's accident.

1230

Plaintiff's testimony was to the effect that to get the machine loose the power had to be on.

The Professor testified as to dangers incident to standing in places other than where plaintiff was standing.

Many of the matters wherein the Professor said the machine was dangerous had no possible connection with plaintiff's accident and could not have been a proximate cause.

XXIV. The specifications of negligence submitted by the court were both specific and broad and all-inclusive. They included:

a—Failure to warn of danger. We have commented on the duty to advise relative to adjustments. Otherwise the dangers were open and obvious and plaintiff was familiar with the machine. The duty to warn relates to latent defects and not something well known.

b—Failure to shield. There was no evidence that the lack of feasible shielding was a proximate cause.

c—No center cable and outside winch. Such equipment related to an entirely different type of unloader.

d—No cutoff switch at the far end or extreme portion of the augers. There was no evidence to support this specification or proximate cause relative thereto.

e—Unshielded square drive shaft. The drive shaft had no connection with plaintiff's injury.

XXV. The submission of specifications of negligence either unsupported by the evidence or entirely outside the range of proximate cause gave the jury too large a field for speculation.

Unless and until we approve a doctrine of absolute liability in the business of building and selling farm implements, jury verdicts must be supported by evidence of actionable negligence or warranty and evidence of proximate cause.

The case is reversed as to defendant Larson. The case is reversed and remanded for a new trial as to defendants New Holland Machine Company, Inc., Sperry Rand Corporation and Lundell Manufacturing Company, Inc.

Reversed as to defendant Larson. Reversed and remanded as to other defendants.

All JUSTICES concur except GARFIELD, C. J., and THORNTON, J., who concur in result.