PAULA PRIEBE, by her parent and natural guardian, BERL E. PRIEBE, appellant, v. THE KOSSUTH COUNTY AGRICULTURAL ASSOCIATION, INC., appellee.

No. 49829.

(Reported in 99 N.W.2d 292)

November 17, 1959.

McMahon & Cassel, of Algona, for appellant.

Linnan & Lynch, of Algona, for appellee.

GARFIELD, J.—The question presented is whether there is substantial evidence, warranting submission to a jury, that plaintiff's personal injury was caused by defendant's negligence in any of the respects alleged. The answer depends upon whether reasonable minds might fairly reach different conclusions from the evidence, when viewed in the light most favorable to plaintiff, as to whether injury might reasonably have been foreseen or anticipated from the conduct complained of.

At the close of plaintiff's evidence the trial court ruled there was no evidence of defendant's negligence and directed a verdict for it. Plaintiff has appealed from the judgment entered thereon. We cannot agree with the trial court.

 Precedents need not be cited for the familiar proposition it is our duty to view the testimony in the light most favorable to plaintiff. See, however, Holmes v. Gross, 250 Iowa 238, 242, 93 N.W.2d 714, 717, 718, and citations; Kohler v. Sheffert, 250 Iowa 899, 901, 96 N.W.2d 911, 912, 913.

Defendant is a corporation which annually presents the Kossuth County Fair in Algona. Plaintiff, age 15 when injured, and her brother Gary, about two years younger, were members of a 4-H Club in the county who had been invited to exhibit at the fair calves raised by them. It seems not to be questioned that they, as well as their father (who paid to get into the fair), were invitees of defendant. They brought their animals to the fairgrounds on the eve of the fair and, as directed, kept them in stalls in a pole barn which was about 60 to 70 feet from the gate to the "ring" where they were to be shown and judged. This ring is inclosed by a fence made of two horizontal boards (apparently not over four and eight inches wide, respectively) a foot or two apart, nailed to upright posts.

Paula (plaintiff), Gary and their father arrived at the grounds on the second day of the fair between 6 and 7 a.m. At 8:30 Gary exhibited a heifer raised by him. Announcement was made over a loudspeaker when animals entered in the various classes were to be brought to the ring from the barn in which

they were kept. As a class left the show ring the next class to be judged was brought in. About 10:30 it was announced that the class in which Gary had entered a 15-month-old animal called "Blackie", weighing 895 pounds, should be brought to the ring. Twenty-five to 30 animals were in this class. All weighed about the same as Blackie.

Gary then led the animal from the pole barn toward the ring. When it was perhaps half way there Gary stopped Blackie so he might put the final touches upon his entry. Paula and her father were there to help. (Paula and Gary helped each other care for their calves.) At Gary's request Paula was holding the rope on Blackie's halter when one of two or three boys chasing each other ran into the front of the animal, causing it to rear up on its hind legs and come down with its front hoofs on Paula's leg, breaking the bones into a number of parts and severely injuring her.

According to the witness Albert Meyer, "The boy flew under the calf and then got up and started running." Mr. Priebe testifies "the kid rolled under the calf, rolled up against my leg and kind of knocked me down." The three Priebes and Blackie had been in the place where the injury occurred two or three minutes. The boys came from a water tank which appears, from photographs before us, to be about 20 feet distant and in plain sight.

There is much testimony Blackie was a quiet animal—indeed a pet. "Before being struck by the boy the calf was standing there kind of half asleep. He had been brushed and curried so many times he enjoyed it." After plaintiff was injured Gary led Blackie into the ring and it was awarded first place in its class. Of course Paula was incapacitated from showing her entry. Others of the 25 or 30 animals in Blackie's class were in the same area but nearer the ring than Blackie was when Paula was injured.

On the morning in question 100 to 150 people in addition to the animals were in the area between the barns and the show ring. The area was open to all who attended the fair. No attempt was made to restrict it, by use of ropes, temporary fencing, police or otherwise, to exhibitors or others helping with the animals. A space of about 50 to 60 feet separates the pole barn

to which Blackie was assigned and the show ring. (As stated, it is ten feet farther to the gate to the ring.) The distance from the east edge of the ring to the west edge of other barns east of it is about 40 or 50 feet. Bleachers for spectators at events in the ring were on the west side thereof. The bleachers were filled with spectators on the morning in question.

There is undenied evidence 10 to 12 boys, age 10 to 12, were "tearing around" among the people and animals in the area between the barns and the show ring at least two hours before Paula was injured and it may be fairly inferred the two or three boys chasing each other were some of them. This was within plain view of the ring where two officials—department superintendents of defendant—were stationed. At least one of them was in the ring all the time.

Mr. Meyer, disinterested so far as shown, testifies:

"Q. Were there children running around the area other than the one you described? A. Yes, there was 10, 12 boys from the age of 10 to 12.

"Q. Would you describe for us their activities, their running? A. Well you know how boys are. They tear back and forth. * * *

"Q. Did it appear anyone was chasing this lad? A. Yes there was two or three of them chasing each other.

"Q. How many calves were in this area adjacent to the show ring getting ready for the next class? A. I would say approximately 25 to 30.

"Q. Were calves being led back and forth in this area? A. Yes * * *.

"Q. Had this activity of the boys you described been going on for some time? A. *That went on all morning there with them boys tearing around there.*

"Q. Did you at any time during this morning see anyone attempt to make any effort to control the activities of the crowd or these boys? A. No. I didn't."

On cross-examination Meyer says:

"Q. There is no way to stop kids from running around fairs is there? A. Well, you take the Spencer fair, they don't do it, they don't allow them to do it. * * *

"Q. They had been doing that for some time, had they? A. *They had been doing it all morning there.*

"Q. Anybody that was out there could have seen these boys running around, couldn't they? A. Yes."

The witness William Decker testifies, "There had been a number of children playing around the area for some time. There was no attempt by anyone to control their activities."

Plaintiff's father says that as soon after Paula was injured as he could leave her, "I went to the show ring where the PA system was and had them make an announcement *to stop all this running around they were doing,* that one girl already had her leg broken and I sure didn't want it to happen to anybody else. Then I went back to Paula." His request for the announcement was to one of defendant's department superintendents and it was made by another superintendent, both of whom were stationed in the show ring.

There is much testimony no police officer was in the area between the show ring and the barns the day Paula was injured. Five of the six city policemen worked part time at the fair, mainly at the entrance to the grounds and near the race track. In addition two others were employed in the daytime, also about seven to nine senior boy scouts who directed parking of automobiles. All officers and scouts wore uniforms. Defendant's secretary testifies that defendant retained complete control of the grounds.

. The above is a sufficient indication of the evidence. Plaintiff's petition alleges defendant was negligent in failing to provide: 1) a reasonably safe area in which to prepare livestock for showing; 2) adequate policing protection to reasonably control the crowd in the vicinity of the livestock sheds and show area; and 3) adequate supervision of the crowd or any restraints for control of the crowd in the vicinity.

■ While defendant is held to a stricter account for injuries to invitees than the owner of private premises generally, it is not an insurer of their safety and owes them only what, under the circumstances, is ordinary and reasonable care. "It seems to be the general trend of the authorities that in almost all cases this question of due care, under the circumstances, is a question for the jury." Clark v. Monroe County Fair Assn., 203

Iowa 1107, 1113, 212 N.W. 163, 165, 166, and citations; Dahna v. Clay County Fair Assn., 232 Iowa 984, 986, 987, 6 N.W.2d 843, 844, 845. See also annotations, 22 A. L. R. 610, 611; 53 A. L. R. 855, 856; 98 A. L. R. 557, 558.

In the Clark case, supra, a race horse bolted the track, jumped the fence surrounding it, ran against a lady standing 20 feet or more from the track and seriously injured her. We held the question whether the fair association used reasonable care was for the jury.

In the Dahna case, supra, plaintiff was injured when the crowd in the amphitheater, at the conclusion of the performance, hurriedly walked down over the seats to the exits. We held the fair association was not negligent in failing to provide guards or ushers to control the persons leaving the amphitheater. The opinion states this from Hawkins v. Maine & New Hampshire Theaters Co., 132 Maine 1, 5, 164 A. 628, 629, was applicable to the case:

" 'It was under no obligation to provide an attendant for every child, or to anticipate the isolated, wilful and sudden act of one boy, the natural tendency of which was to inflict serious harm upon another. There is no evidence that such an incident ever had happened before or that the defendant had any warning whatsoever that it was likely to take place. It was not a danger which it was bound to have foreseen or to have guarded against.' " (Pages 988, 989 of 232 Iowa, page 845 of 6 N.W.2d)

In the Hawkins case from Maine (cited by defendant here) a patron was injured by the sudden act of a boy, without warning, in shooting with a slingshot at toy balloons in a theater. It may be conceded that if the conduct of the boy who struck the calf here were a sudden, isolated act which could not reasonably have been anticipated, the trial court's ruling was right. But we think reasonable minds might fairly conclude defendant could reasonably have foreseen someone might be injured from the conditions it permitted to exist, without any attempt to remedy them, for a considerable time on the day in question.

Our opinion in the Dahna case, supra, quotes this further excerpt from the Hawkins case in Maine, supra:

" 'The obligation, which the proprietor of a theater or amusement enterprise owes to his guests, has been clearly set

forth. He must guard them not only against dangers of which he has actual knowledge but also against those which he should reasonably anticipate. [Citation] The failure to carry out such duty is negligence. A recovery may be had, even though the wilful or negligent act of a third person intervenes and contributes to the injury, provided such act should have been foreseen.' (Citing cases.)" (Page 987 of 232 Iowa, page 845 of 6 N.W.2d)

<span style="background:black"> </span> In order to constitute negligence it is not necessary that defendant could have foreseen the particular injury that resulted provided it should have foreseen its omission to act would probably result in injury of some kind to some person. Kaffenberger v. Holle, 237 Iowa 542, 547, 22 N.W.2d 804, 807, and citations; McGrean v. Bos Freight Lines, 240 Iowa 318, 322, 36 N.W.2d 374, 377. See also Gibson v. Shelby County Fair Assn., 241 Iowa 1349, 1355, 44 N.W.2d 362, 365; Connolly v. Nicollet Hotel, 254 Minn. 373, 95 N.W.2d 657, 664.

Although the facts in the McGrean case, supra, are not analogous, this from the opinion by the late Justice Smith may be repeated here:

"But when is the court to say, *as a matter of law*, that danger should not have been reasonably anticipated, and when should the question be left to the jury? Who is to determine when the situation is such that a reasonably prudent man should not have foreseen the probability of injury resulting? * * *.

"* * * Recent decisions of this court have gone far in holding it proper to submit to the jury the duty of resolving close fact and inference cases to the jury. See e.g. Lawson v. Fordyce, 234 Iowa 632, 12 N.W.2d 301. * * *.

"We have said the question is close. In such case we deem it our duty to resolve our doubts in favor of submission to the jury. There was substantial evidence of the circumstances we have pointed out and the question of whether reasonable prudence should have suggested probable danger was for the jury." (Pages 321–323 of 240 Iowa, pages 376, 377 of 36 N.W.2d)

<span style="background:black"> </span> Many decisions from other jurisdictions support our holding here. A number of them apply section 348, Restatement, Torts, as the controlling principle. It states a "possessor of land who holds it out to the public for entry for his business purposes is subject to liability to members of the public while upon the

land for such a purpose for bodily harm caused to them by the accidental, negligent or intentionally harmful acts of third persons or animals if the possessor by the exercise of reasonable care could have (a) discovered that such acts were being done or were about to be done, and (b) protected the members of the public by (i) controlling the conduct of the third persons * * *."

Here the finding would be warranted that defendant knew of, or should have discovered, the conduct of the boys which caused plaintiff's injury and, by the exercise of reasonable care, could have protected her by controlling such conduct. As stated, the evidence is no attempt was made to control the activities of the boys until after plaintiff was injured. A jury could properly find it would not have been difficult for one or two of the uniformed police officers on duty at the fair to restrain ten or twelve young boys from "tearing around" a long time in a crowd of people, among many animals. Most boys like these have a good deal of respect for even one such officer. Apparently the showing of the 4-H Club animals was the principal attraction at the fair on the morning in question. Also a jury would be justified in finding defendant could, by the use of ropes or temporary fencing (such as the familiar snow fencing along highways), have restricted the small area between the show ring gate and near-by barns to the exhibitors, their animals and helpers.

We briefly review some of many precedents that support our decision here:

Schwartzman v. Lloyd, 65 App. D. C. 216, 82 F.2d 822. Plaintiff was injured by the breaking of a display window when a crowd tried to enter a store for a sale. Defendant contended it was entitled to a directed verdict in part because the evidence showed prior sales similarly conducted had proceeded without mishap, but the court held (at page 827 of 82 F.2d): "The mere fact that no mishap occurred in such other sales does not necessarily mean that the likelihood of a mishap ought not to have been guarded against there as here." (There is no similar evidence in the present case.) Many decisions somewhat similar to Schwartzman v. Lloyd are reviewed in annotation, 20 A. L. R.2d 8.

Quinn v. Smith Co., Inc., 5 Cir., Fla., 57 F.2d 784. Plaintiff, a patron at defendant's swimming pool, was struck and hurled into the pool by a group engaged in horseplay.

Rawson v. Massachusetts Operating Co., Inc., 328 Mass. 558, 105 N.E.2d 220, 29 A. L. R.2d 907. Plaintiff, a patron in defendant's theater, sat behind six or seven boys who for one and one-half hours were talking, laughing, yelling and throwing popcorn toward the stage. When all the boys but one started to leave plaintiff asked him why he didn't go home with the others, whereupon the boy struck and injured plaintiff. The court held (page 560 of 328 Mass., page 221 of 105 N.E.2d, page 910 of 29 A. L. R.2d) "the jury could find that the defendant was remiss during one hour and one half in failing to discover and stop the disorder; that the defendant should have known that if it did not take such action, it was to be reasonably anticipated that patrons might undertake to supply the omission; and that if that happened, the authors of the rowdyism might resent such unofficial interference with their misbehavior, and might even commit a cowardly assault in the dark upon a remonstrating patron. Cases of this sort present a wide variation in their facts."

Fortier v. Hibernian Bldg. Assn., 315 Mass. 446, 53 N.E.2d 110, a leading case. Plaintiff was waiting in the lobby of defendant's building to attend a banquet when a group of boys who were chasing each other ran into her and threw her to the floor. "But, for an hour at least before the plaintiff was injured, the group of boys who finally caused her harm were running in and around the lobby on the first floor of the building and so conducting themselves as to constitute a potential danger to the plaintiff and other persons who were rightfully in the lobby." (Page 450 of 315 Mass., page 113 of 53 N.E.2d)

Wilson v. Norumbega Park Co., 275 Mass. 422, 176 N.E. 514. The mother of a six-year-old child on a pony being led by an attendant in an amusement park was injured when a larger pony, driven by a boy of 12 or 14, ran into her from behind. The boy was racing the larger pony with the others.

Johnson v. Amphitheatre Corporation, 206 Minn. 282, 288 N.W. 386. Plaintiff was injured in the lobby of a roller-skating

rink when two boys chasing each other fell down and one of them struck her ankle. "* * * the jury could well find that defendant knew that young lads of high-school age were among its patrons, that these were prone to chase one another or play tag skating in the lobby, and that defendant knew that such conduct was dangerous to other patrons in the lobby, that defendant did not exercise due care to prevent such skating there, and that such negligence or want of due care was the proximate cause of plaintiff's injury." (Page 286 of 206 Minn., page 388 of 288 N.W.)

Hughes v. Saint Louis National League Baseball Club, 359 Mo. 993, 1000, 224 S.W.2d 989, 994, 16 A. L. R.2d 904. Plaintiff was injured when one of a group of boys, who had been wrestling and pushing each other, ran into her as she started to cross the playing field at defendant's park after attending a baseball game. Defendant argued the boys' activities "were so spontaneous and sudden in their commencement and effect that there was no time to even warn plaintiff after they began", citing Hawkins v. Maine & New Hampshire Theaters Co., supra, 132 Maine 1, 164 A. 628 (cited by defendant here and the principal authority for our decision in Dahna v. Clay County Fair Assn., supra, 232 Iowa 984, 6 N.W.2d 843), and another case. The Hughes opinion states, "However, these cases are not in point because they involve isolated, sudden acts of one person." (Page 910 of 16 A. L. R.2d)

The annotation to the Hughes case in 16 A. L. R.2d 912, 932, says: "It is not uncommon for patrons of public amusements to be injured as a result of the horseplay, boisterousness, or other playfulness of others. It has been held or recognized that the proprietor or operator of such an amusement is liable to the patron for injuries thus sustained, provided he had sufficient notice to enable him to stop such activities." (Citations)

Hill v. Merrick, 147 Ore. 244, 31 P.2d 663. Plaintiff, a girl under 16, ascended a diving tower, 12 feet high, at defendant's swimming pool where she was jostled and pushed into the pool by three or four boys on the platform. Seven or eight children were playing tag on the steps and platform of the tower. "The evidence indicated that the proximate cause of the accident was the negligence of defendant in permitting the children to play

tag on the high dive and jostle or push plaintiff." (Page 252 of 147 Ore., page 666 of 31 P.2d)

Lee v. National League Baseball Club of Milwaukee, 4 Wis.2d 168, 89 N.W.2d 811. Plaintiff, a paying spectator at a baseball game, was pushed off her chair and trampled upon by other spectators attempting to recover a foul ball near plaintiff's chair. "It has generally been held that one who invites the public to a public amusement place operated by him is liable for injury sustained by an invitee as a result of acts of third persons, if such operator has not taken reasonable and appropriate measures to restrict the conduct of such third parties, of which he should have been aware and should have realized was dangerous." (Citations) (Pages 172, 174 of 4 Wis.2d, pages 813, 814 of 89 N.W.2d) The opinion also states, "Special stress is placed upon the testimony that no person had previously been injured in a scramble for a ball batted into the stands at any prior baseball game in the stadium during the operation of the same by the defendant."

Pfeifer v. Standard Gateway Theater, 259 Wis. 333, 336, 337, 48 N.W.2d 505, 507, a leading case. Plaintiff, a boy about 11, lost the sight of one eye when hit by a spitball shot from a rubber band by one of about five boys who were throwing popcorn boxes and shooting paper wads in a theater. The court quotes this from Schubart v. Hotel Astor, Inc., 168 Misc. 431, 5 N.Y.S.2d 203, 207, affirmed 281 N. Y. 597, 22 N.E.2d 167:

" 'When one assembles a crowd * * * upon his property for purposes of financial gain to himself he assumes the responsibility of "using all reasonable care to protect the individuals from injury from causes reasonably to be anticipated." In the exercise of this duty it is incumbent upon him to furnish a sufficient number of guards or attendants and to take other necessary precautions to control the actions of the crowd; and whether the guards furnished or the precautions taken are sufficient is ordinarily a question for the jury to determine under all the circumstances.' "

In the Pfeifer case the trial court, in directing a verdict against plaintiff, relied upon Emerson v. Riverview Rink & Ballroom, 233 Wis. 595, 290 N.W. 129, 131, cited by defendant here. Emerson, a patron of a roller-skating rink, was injured

by a couple of skaters while standing outside the regular skating area. In distinguishing the Emerson case (from which two judges dissented) the court quotes this from it:

" 'There is no evidence as to how long or how fast this couple had been skating, and no evidence from which it could be concluded that their manner of skating was such as should have attracted the attention of the guards and resulted in intervention prior to the accident. * * * There is nothing to indicate that they [the couple] were skating at a fast and dangerous pace for a sufficient time or under such circumstances that they should have been discovered and stopped by the guards.' "

The Emerson decision is also distinguished in Lee v. National League Baseball Club of Milwaukee, supra, 4 Wis.2d 168, 175, 89 N.W.2d 811, 815.

See also, in addition to the foregoing precedents, Fimple v. Archer Ballroom Co., 150 Neb. 681, 35 N.W.2d 680; Redmond v. National Horse Show Assn. of America, 78 Misc. 383, 138 N. Y. S. 364.

Authorities cited by defendant are not in conflict with our decision here. In the main they are cases where injury was caused by some sudden, isolated act of one or two persons which the defendant had no reason to foresee would be likely to occur or to cause harm. As we have tried to explain, Hawkins v. Maine & New Hampshire Theaters Co., supra, 132 Maine 1, 164 A. 628, and Emerson v. Riverview Rink & Ballroom, supra, 233 Wis. 595, 290 N.W. 129, are of this kind.

In Ruehling v. American Legion Pavilion, Inc., Minn., 96 N.W.2d 702, 703, also cited by defendant, plaintiff was suddenly grabbed and injured as he was entering a dance hall. The only evidence of horseplay prior to the injury was that plaintiff's assailant had pulled plaintiff's tie in a friendly manner.

The facts in Kapphahn v. Martin Hotel Co., 230 Iowa 739, 298 N.W. 901, bear no analogy to the facts here. The opinion stresses what we recognize here that reasonable foreseeability of harm is the fundamental basis of the law of negligence.

It is not claimed here that plaintiff was contributorily negligent as a matter of law.—Reversed and remanded.

All JUSTICES concur.