Russell M. KNUDTSON, Appellee,

v.

Gordon SWENSON, Melvin Juveland and
Harlan Evenson, Appellants.

No. 52581.

Supreme Court of Iowa.

Jan. 9, 1968.

Rehearing Denied March 5, 1968.

Floyd E. Ensign, Northwood, for Gordon Swenson, appellant.

Weible & Stipp, Forest City, for Melvin Juveland, appellant.

Linnan, Lynch & Straub, Algona, for Harlan Evenson, appellant.

Westfall, Laird, Burington, Bovard & Heiny, Mason City, and Eugene Sarno, Lake Mills, for appellee.

SNELL, Justice.

This is a farm accident case. It presents a vivid illustration in support of legislation in the field of workmen's compensation for farm labor. That is a problem for the legislature. We have no authority to legislate. Until we have such legislation there must be more than evidence of an on-the-job injury to support recovery of damages. In this case a sympathetic trial judge made an award to plaintiff. If supported by substantial evidence the findings are binding on us. However, we fail to find factual support, i. e. evidence, for his findings as to actionable negligence, proximate cause and freedom from contributory negligence. More than usual quotation from the record seems necessary.

Plaintiff herein was injured on September 19, 1964 in a silo filling operation. He lost a hand in moving machinery. Plaintiff was an employee of defendant, Gordon Swenson.

Defendant, Gordon Swenson, was the owner and operator of silo filling equipment. He did custom work for farmers. He furnished a tractor and field cutter, three unloading (chop) wagons, the silage blower and tractor, and the labor of two men. He operated the field cutter, and his employee, plaintiff herein, operated the blower at the silo and the machinery unloading the silage from the wagons to the blower. Swenson was an independent contractor and was paid $10 or $11 a foot for filling the silo.

Defendant, Melvin Juveland, was a farmer and had a silo holding about 70 tons. By oral contract he employed Swenson to fill his silo. Juveland was to furnish three men and three tractors to pull the wagons. His men were his two sons and Harlan Evenson, a neighbor.

Harlan Evenson was a farmer who exchanged work with Juveland. He was helping on an exchange of work basis with no cash pay involved. He operated one of the tractors and hauled wagons from the field to the blower. At least part of the time he helped plaintiff in the unloading of the wagons, i. e. the wagons he brought in. The wagons furnished by defendant Swenson included two John Deere Chuck Wagons Model 110.¹ One of the chuck wagons was being unloaded when plaintiff was injured.

The trial court in Findings of Fact described the operation of the chuck wagon as follows:

"The John Deere Model 110 Chuck Wagon owned by the Defendant Swenson * * * was a wagon among other things designed for hauling cut silage from the field to the silo for unloading into a blower and eventually the silage would be blown into the silo; that said wagon is equipped with an apron belt on the bottom part of the body of the wagon box for moving the silage forward; that on the front end of the box there are three sets of beaters which

**758**

pull the silage from the box to the conveyer at the front end of the box; that there are about 48 spokes on each of the three beaters and the beaters are about three inches in length and one-half inch in diameter; that as the apron at the bottom of the box moves forward the silage is moved forward toward the beaters which break up the silage so that it becomes loose and goes into the conveyer on the front of the wagon which in turn conveys the silage from the wagon into the blower which eventually elevates the silage into the silo. (Exhibits D–A and D–D show the type of wagon.)

[We reproduce these exhibits from the record.]

Exhibit DA

Exhibit DD

"* * * the mechanism of the conveyer on the front end of the wagon and particularly the beaters when in operation is a very dangerous piece of equipment as evidenced by the warning sign on the front of the machine. (See Exhibits D–A and 1 and 3.)

[Exhibit 1 is reproduced from the record. Exhibit 3 is an operator's manual from which we reproduce pictures of the wagon.]

Defendants' Exhibit 1

REPRODUCED FROM EXHIBIT 3

John Deere 110 "Chuck Wagon" Mixer-Feeder and 963 Wagon

## EXTENSION SIDEBOARDS

For handling forage crops and other bulky material, install the extension sideboards.

---

"The Court finds from the evidence that a portion of the shield or guard covering the area where the silage comes out of the hopper or that portion which protects the

area when the beaters are in operation has been cut out or enlarged by the Defendant Swenson.  (See ragged edge as shown in Exhibit D–B and Exhibit D–C.)  [Reproduced from the record.]

Exhibit DB

Exhibit DC

The Court finds that the enlarging of the opening by the Defendant Swenson increased the hazard to the operator of the chuck wagon and in this case to the plaintiff, Russell M. Knudtson.

"The Court finds from the evidence that the Defendant Swenson had made a fork like rake for the purpose of raking off the silage from the top of the wagon thus making the entry of the silage into the hopper on the conveyer in the front of the wagon in a uniform manner."

The court's findings as to the cutting out of the shield are without support in the record. We quote from plaintiff's testimony:

"I was familiar with the chuck wagon known as 110; I knew how to operate it; I learned this from observation and watching it operate; I knew it was equipped with beaters. I know that when the beaters are in operation they go at a high rate of speed; that in connection with the accident load they were not going rapidly or slowly and were going at about the same speed on all of the loads. I knew that the beaters generated a great deal of power; I knew that it would be dangerous to touch them with any part of my hand or body, and I found out that it would be dangerous to touch these beaters and I knew this before the accident happened.

"Q. Now was there anything mechanically wrong with the wagon which carried the accident load? A. Just the cut out.

"In connection with the cut out of the wagon as shown in Exhibit DB, if I faced the cut out portion the part which was cut out was at the upper left-hand part of the opening. The cutting angled up to the upper left hand corner of the opening. The tooth on the bottom beater is visible at the lower right-hand corner and the cutting is away from the place where the tooth is shown in Exhibit DB as we are viewing it here.

"The wagon carrying the accident load was in the same condition when I first came to work for Swenson as it was when I was injured.

"Q. And you have no knowledge how the cutting was accomplished or who cut it? A. No. I don't.

"Q. You don't claim Mr. Swenson did it? A. No.

"In the silo-filling operations of 1963 and 1964 the blower clogged twice in 1963; it would take a large chunk of silage to clog the blower; when it clogs up it sometimes kills the tractor motor; when the blower clogs up I disengage the power take-off by getting on the tractor and pulling the clutch clear down and shutting the tractor off.

"Q. Why do you do that? A. You can't stick your hands in there without taking that off.

"Q. Could you take it apart with the power take-off running? A. No. You could but it wouldn't be safe.

"Q. So whenever it plugs up, you knew it wasn't safe to be fooling around in there so you would shut off the power take-off, is that correct? A. That's right.

"Q. Now when the silage came into the conveyor on the accident load, you knew it was dangerous to put your hand in there too, didn't you? A. I didn't put my hand in there.

"Q. You knew it would be dangerous if you did put your hand in there? A. Yes.

"Q. You knew if you put your hand in there you were apt to have it badly injured, didn't you? A. That's right.

"* * *

"Q. Now were all of the guards in place and all the shields in place on this wagon? A. Except that one place where it had been cut.

"Q. There was no shield for that as far as you know? A. No.

"Q. Is it a fact the enlarging of the opening there would permit the silage to come out more freely? A. Yes, I reckon it would."

Defendant Swenson testified without objection or contradiction in the record:

"Q. Now, Mr. Swenson, there has been some talk here about cutting away of the opening out of which the silage exits as it goes into the chute and then into the blower, were you present when that testimony was introduced? A. Yes.

"Q. I direct your attention to this drawing and you will observe that it indicates that starting at the right hand corner of the opening as you face the side of the chuck wagon, that it extends out for a distance and then it goes up into the left hand corner. Now do you have any notion how far it is from the right hand corner to the point where it starts to go upward? A. I wouldn't know exactly, I would judge somewhere between six and eight inches I believe.

"Q. Do you have any knowledge as to the approximate size of this opening out of which the silage exits? A. No, I never measured it.

"When I bought the chuck wagon the opening was not as shown in the illustration. The opening was straight across instead of the diagonal cut. A change was made on this opening.

"Q. And by whom was that made? A. By the John Deere Company.

"Q. Will you tell me the circumstances surrounding that change? A. Well, I used this wagon the first year without this modification and in the winter the dealer told me that he would have—the dealer told me he would have to pick the wagon up and put a modification on it and this was done, the web in the bottom of the wagon or the apron also was reinforced at that time. * * *

"Q. Did you make this modification? A. No I didn't.

"Q. What did you do?· A. I didn't do anything. I didn't even know that the modification was out until they told me that they were going to come and pick the wagon up.

"Q. What is the fact as to whether or not someone came and took the wagon? A. Yes, they did.

"Q. And who was that? A. Erlinson Implement at Albert Lea.

"Q. And is Erlinson Implement Company a John Deere dealer? A. Yes.

"Q. And is this where you bought this wagon? A. Yes, that's right.

"Q. And do I understand that they came and took the wagon? A. Yes.

"Q. And did they bring it back? A. Yes.

"Q. And was the wagon in the same condition when they brought it back as when they took it? A. No, these changes were made.

"Q. And what was the change? A. Well this modification of enlarging the opening on the front conveyer and reinforcing the slats on the bottom conveyer of the main wagon. * * *

"Q. And was it in the condition, in that condition the first time Russell Knudtson operated the wagon? A. Yes."

At the time of the accident the extensions or side boards were on the chuck wagon. See Exhibits DA and DD, supra. This was in accord with the operator's manual See picture from Exhibit 3, supra. Throughout the day the wagons had been fully loaded.

To aid in an even flow of silage through the beaters and to the conveyer and blower defendant Swenson had furnished a long handled rake or three-tined fork. Plaintiff testified:

"When a load was brought up, I would pick up the rake and give it to whoever brought that load. The person that brought the load in would use the rake on the silage at the top to keep it even flowing. In connection with each operation the driver of the tractor pulling the chuck wagon would pull it up, or in other words, pull it into the blower and then I would lower the conveyer that sticks out a couple feet or so. This is the conveyor in the front end. I would lower the conveyer because it would be right up against the chuck wagon. The driver would stop where I would want him and I would take the power take-off. As he drove up and stopped, I would lower the conveyer. This is the conveyer on the front end. When the driver stopped, the motor on his tractor would still be running and he either would have the clutch in or the tractor would be out of gear. It had to be one of the two when he stopped. I would then pull the power take-off shaft out of the chain, bring it over to the tractor and hook it up for them and then the driver would start his power take-off. * * * After I have attached the power take-off from the wagon to the tractor and the operator of the tractor pushes down the clutch with his foot to engage the power take-off. Next I would start the big apron that pushes the silage ahead by raising the lever up. The conveyer in the front end of the chuck wagon gets its power from the power take-off and the conveyer is not controlled by the lever. It is connected with the beaters which are also powered by the

power take-off, the power take-off of the tractor that is pulling the wagon. The power take-off runs the three beaters along with the front conveyer. * * * After the operator of the tractor has engaged the power take-off, he then gets off of the tractor and grabs the fork. He uses the fork to scrape the high silage down. He does this by pulling the fork down and towards him. In doing this he can stand on either side of the power take-off. After the load is emptied, he would stop the power take-off and he would then take off for the field. * * *

"When the accident happened it was Harlan Evenson's load. After he brought the load up and stopped the tractor, I let the conveyer down which was on the side. I then hooked up the power take-off for him. He then started the power take-off and engaged the clutch and then he walked around his tractor and wagon and went on the other side. I did not know what he was going to do. I did not hear him say anything about going any place. After a while I saw that he had a tractor and wagon and was headed for the field. * *

"While I was in the process of unloading it, the silage came down over the front end, some went in the conveyer, some went on the ground and just as the silage came over the top and went down, I hit the lever and put it in neutral. In other words I put the apron in neutral, and it no longer moved. I am talking about the big apron that moves the silage up. As I mentioned, some of the silage went down in front of the chuck wagon and what did not go down in front of the chuck wagon went in the conveyer in the front end. Insofar as the conveyer in the front end was concerned, the silage came out and stuck out 8 to 10 inches and the conveyer chain in the front went in under. The silage that stuck out I just pushed down. In other words, after this silage had fallen over the front of the wagon, some of the silage continued to come out on the front conveyer. This caused trouble in that so much came that it filled the hole clear up and the beater and it stuck out about 10 inches. I pressed down on it and my hand went like that. When I say it filled the hole, I am referring to the hole that is shown on this Exhibit DC. This hole is the opening above the conveyer and it was plumb full. The silage stuck out beyond about 8 or 10 inches. During this time the conveyer that is shown in this Exhibit, in other words, the front end conveyer continued to run.

"Q. And while it was running, was it continuing to take the fodder out or not? A. Not when the big chunk came in there. I stood right there.

"Q. After that big chunk came in there, was the fodder coming out of the conveyer or was it running empty? A. The conveyer chain was running empty. The silage was there. That's when I pushed down on it and my hand went in. * * *

"I pressed down with my right hand and I did not have to move any place to do that. At the time I pushed down on this silage, I could not see any of the beaters. This was because they were full of silage. In pushing down I did not attempt to dig it out. * * *

"Q. You just tell us in your own words how you endeavored to get that clogged silage to move on? A. Well, it stuck out 8, 10 inches and I pushed down and it took my hand at the same time.

"Q. And in pushing down what were you endeavoring to do? * * *

"I was trying to get the silage to move out. The reason I pushed down in trying to get the silage to move out was so the conveyer in the bottom would take it out. After Harlan Evenson got off his tractor and left, there was no one helping me. I saw the beater in there but at no time after it got clogged up before my arm got caught in there did I see the beater itself. After it had gotten clogged and I pushed down, I did not see the beater at any time."

Plaintiff's hand was caught in the beaters and he lost his hand and part of his forearm.

Plaintiff testified that he was standing on level ground and that it was a safe place to work. He also testified:

"Q. Were any of the tools with which you were supplied mechanically wrong in any respect? A. No.

"Q. And you knew the operation of all the tools? A. Yes.

"Q. And you knew the function of each tool? A. Yes.

"Q. And what it was to be used for? A. Yes."

Plaintiff was 59 years old. He was an experienced farm worker. He testified: "I haven't done much of anything other than farming and working in a lumber yard. * * * I have worked around farm machinery ever since I was big enough and I am thoroughly acquainted with power machinery."

He had worked for Mr. Swenson filling silos in the fall seasons of 1963 and 1964. He had done the same kind of work with the same equipment in the same condition as on the day he was injured. There was nothing new, unknown or unexpected about the situation except putting his hand too close to the silage beaters. He was within 3 or 4 steps of where he could have shut off the power. He also testified:

"A part of the chunk came out of the hole and it stuck out about 8 or 10 inches.

"Q. How long was it there before you did anything? A. Well, I don't—I don't think it was there very long sticking out there and I pushed down on it and my hand was gone.

"Q. When this thing came out about 8 or 10 inches, where was the fork? A. The fork was hanging on the front end of the wagon.

"Q. Could you have reached it with your left hand? A. Yes, I could.

"Q. Could you have taken the fork and pulled out the chunk of silage out of the opening? A. Yes, I could.

"Q. You could have? A. Yes.

"Q. Did you do this? A. No.

"* * *

"Q. As the chunk was stuck in the opening the conveyer was working against it trying to push it out, is that correct? A. That's right.

"The chunk of silage filled the opening; the beater is on the right-hand side of the opening close to the edge of the opening.

"The beater is inside the wagon and the first tooth was about a half inch inside the wagon.

"I put my hand right up on top of the silage and pushed down on it; I reached across the silage.

"Q. And pushed into it? A. No, I didn't push into it, I pushed down on the silage.

"Q. But you claim your hand did get inside the wagon? A. The beater hit it.

"Q. Was it the beater inside the wagon? A. Yes.

"Q. Then can you tell me how the beater struck your arm without getting it inside the wagon? A. I can't tell you that."

As quoted, supra, plaintiff said "I didn't put my hand in there." Of course, he did not intend to put his hand in machinery where it would be cut off. However, the evidence is without dispute that plaintiff, voluntarily and without shutting off the power put his hand into an accumulation of clogged silage in too close proximity to moving and dangerous machinery.

There was no machinery moving toward the beaters from where plaintiff stood. He

neither fell nor was pulled into the machinery. The only possible way for plaintiff to get his hand in the machinery was to put it there.

There was no showing of anything wrong with the place to work. There was no showing of anything wrong with the machinery attributable to any of the defendants. There was no showing that what plaintiff did was at the suggestion of anyone or necessarily incident to his work. What he did was in direct violation of the sign facing him from the end of the wagon.

Plaintiff claims that the chuck wagon was overloaded. He said that he had mentioned the size of the loads to Swenson but he does not mention any comment as to danger incident thereto. On cross-examination he said that his complaint was in 1963; that nothing was done about it; that he did not complain in 1964 and that there was nothing unusual about the way the wagons were loaded on the day of the accident. He also testified that the accident load was about one-fourth unloaded when the accident occurred. If so, the wagon was not overloaded at the time of the accident. There was no evidence that the wagons had ever been loaded above the sideboards recommended in the operator's manual for use in hauling fodder or that clogging or matting ordinarily resulted when the wagons were so loaded. The silage that caused the clogging came from inside the wagon. Plaintiff said he pushed down on the part that stuck out. The beaters were inside the wagon. The only other moving parts were moving out and not in. The conveyer was attempting to move the silage away. If plaintiff pushed down on the silage in the conveyer his hand would have been pulled away from the beaters. The only way plaintiff's hand could have come in contact with the beaters was for plaintiff to stick his hand inside the wagon.

Plaintiff also testified that after the accident Swenson said it was his (Swenson's) fault, he had overloaded the wagon.

Swenson denied ever admitting it was his fault. He did testify that he told plaintiff "that if he felt they were overloaded and had a case, I felt that he should go ahead and file."

His sympathy for his injured workman is commendable but it is far short of establishing actionable negligence proximately causing plaintiff's injury.

Plaintiff claims that defendant Evenson was negligent in returning to the field rather than staying and helping plaintiff. There is no claim of any act of misfeasance on his part.

■ There was no evidence of actionable negligence on the part of any defendant. There was no evidence that anything any defendant did or failed to do proximately caused plaintiff to stick his hand in the machinery. The evidence is conclusive that plaintiff's injury came about as a result of his own voluntary act.

■ I. We have had many farm accident cases before us. We have gone far in upholding awards where there was any evidence to support a finding of liability. We have never gone so far as to uphold an award so lacking in support as here. We view the evidence in the light most favorable to plaintiff but there must be some evidence.

Our most recent review was in Kregel v. Kann, Iowa, 152 N.W.2d 534, decided August 31, 1967. We said:

" 'It is a settled rule that an employer must use reasonable care to provide and maintain for his employees reasonably suitable and safe appliances, machinery and tools with which to work.' [Citations]

"However, the employer is not an insurer of the safety of the tools, machinery or appliances, nor of the safety of the employee in using the instrumentalities furnished but is only liable for negligence. [Citations]

"The employer must exercise reasonable care to eliminate dangers which are not the usual or ordinary incidents of the service when he has exercised such care. [Citations] * * *

"While the duty of the employer to provide his employee with reasonably safe tools with which to work is owed alike to the young and old, skilled and unskilled, whether the employer has performed such duty depends in some degree on the experience, maturity, intelligence, and discretion of the employee. [Citations] * * *

"The ground of defendant's liability is not danger, but negligence. Until we have a law such as Workmen's Compensation applicable to farm employment there is no absolute liability of the employer for injuries to his employee. Wagner v. Larson, 257 Iowa 1202, 1211, 136 N.W.2d 312, 318."

II. In Frederick v. Goff, 251 Iowa 290, 100 N.W.2d 624, plaintiff was injured in a silo filling operation. He was attempting to reconnect parts that had come apart. The parts were worn, did not fit properly and had become disconnected on several prior occasions, including three or four times while the same load was being unloaded that morning. Defendant was fully aware of the condition. We held there was substantial evidence to support a finding of providing defective equipment for plaintiff to work with. Neither the factual background nor the holding supports plaintiff's position in the case before us here.

III. In Von Tersch v. Ahrendsen, 251 Iowa 115, 99 N.W.2d 287, we upheld an award following a farm machinery injury. Plaintiff had no prior experience with power take-off machinery. Defendants had previously purchased and installed a power take-off assembly for their tractor but had never attached the shield that was furnished. They had neither warned nor instructed plaintiff. Plaintiff slipped on muddy ground. His sleeve was caught by a protruding fitting and his arm was pulled into the machinery. There was substantial evidence defendants were negligent in not furnishing plaintiff reasonably safe machinery. They failed to install safety equipment furnished them.

Such is not the case here.

IV. In Calkins v. Sandven, 256 Iowa 682, 129 N.W.2d 1, plaintiff was injured when he tripped on rough ground or corn cobs and his arm was caught in the moving parts of a self-unloading farm wagon. Defendants were the manufacturer and owner of the wagon. There was evidence of inadequate shielding of the moving parts and of danger not open and obvious. In the case at bar we have no claim against the manufacturer. In the cited case plaintiff had no previous experience with the equipment. He had no warning as to hazards incident thereto. Defendant owner had owned the equipment for two and one-half years and "was much more familiar with the machine then plaintiff was."

We held there was a jury question as to negligence in failing to provide a safe instrument with which to work and failing to warn of danger. Neither situation is the issue here.

In the case at bar according to plaintiff's own testimony we have no comparable situation. Plaintiff was experienced, knew all about the operation of the equipment and needed no special warning from his employer. He said he had a safe place to work. There was no claim of inadequate shielding. There was nothing wrong with the machinery.

V. In Livingston v. Morarend, Iowa, 149 N.W.2d 850 (Apr. 4, 1967) plaintiff was injured in a silo filling accident. While a hopper was being raised plaintiff was struck by the hitch extending from the end of the hopper. There was a conflict in the evidence as to plaintiff's experience and familiarity with the operation of the equipment. There was testimony that there was an accumulation of hay and debris covering the protruding hitch. Plaintiff testified that he was not aware of the

protruding hitch. Defendants had given no instruction or warning.

We described the evidence as thin but concluded that it was sufficient for a jury to conclude that defendants failed in proper precautions for the safety of the workers. The case at bar has even less factual support.

We cannot let our sympathy for an injured worker or imagination in searching for evidence of negligence go beyond our previous holdings.

VI. Wagner v. Larson et al., 257 Iowa 1202, 136 N.W.2d 312, involved injuries suffered in a silo unloader. We reviewed the evidence and the authorities and set aside a judgment against the employer for lack of evidence of negligence. We refused to hold the farm employer negligent in failing to exercise the judgment that might be expected of a mechanical or safety engineer. Loc. cit. 1213, 136 N.W.2d 312. That case affords no help for plaintiff herein.

VII. In Lockwood v. Wiltgen, 251 Iowa 484, 101 N.W.2d 724, we considered causal connection between negligence and plaintiff's injury. The two incidents were only seconds apart. We said: "The evidence was sufficient to support a finding by the jury that these two incidents were so connected that the first was a proximate cause of the second." (loc. cit. 492, 101 N.W.2d 729)

■ In the case at bar defendant Swenson's custom in loading wagons in the field, not even established as negligence, was too remote to be a proximate cause of plaintiff putting his hand in the moving parts of the machinery when a wagon was being unloaded.

VIII. Plaintiff claims defendant Evenson was negligent in returning to the field instead of remaining to help unload the silage. At the most Evenson's departure was an act of nonfeasance. There is no evidence that he was ignoring any instructions from Juveland for whom he was working or Swenson, who, as contractor, was in charge. He was not derelict in the performance of any duty assigned to him by anyone in authority.

It appeared without controversy that as the loads were brought in from the field the drivers would ordinarily help unload and that Evenson did so. The first day *plaintiff* told Evenson to be there and rake. Evenson was not there all the time and there is no evidence that plaintiff had any authority to direct the duties of the several workers or that Evenson by helping fork silage assumed any continuing duty relative thereto. When Evenson left for the field before the accident plaintiff saw him go. Plaintiff made no complaint but continued his work alone.

In Wendland v. Berg, 188 Iowa 202, 174 N.W. 410, this appears: "It is the general rule recognized in this state that an agent is not personally liable to a third party for mere nonfeasance." (loc. cit. 204, 174 N.W. 411)

In Emery & Company v. American Refrigerator Transit Company, 193 Iowa 93, 184 N.W. 750, 20 A.L.R. 86, nonfeasance is distinguished from misfeasance and malfeasance, and this appears: "The courts, recognizing this distinction, hold as a general rule that the agent is liable to his principal for nonfeasance, that is, for an entire failure to perform his contract with his principal, but that for such nonfeasance a third party cannot recover from the agent." (loc. cit. 98, 184 N.W. loc. cit. 752)

■ There is nothing in this record to support an award against Evenson. Juveland, the farm owner, had nothing to do with the accident except through his helper Evenson.

■ IX. Generally questions of negligence, contributory negligence and proximate cause are for the jury; it is only in exceptional cases that they may be decided as matters of law. Rule 344(f) 10. Rules of Civil Procedure. This does not mean that evidence is unnecessary or that uncontra-

dicted facts to the contrary may be ignored. The trier of the facts may choose to disbelieve testimony but that does not bolster a requirement that is nonexistent.

The record before us is insufficient to support a finding of actionable negligence or proximate cause. Defendants' motions for directed verdict should have been sustained.

The trial court found that there was no merit in defendants' claim that plaintiff was contributorily negligent. Because of our other conclusions we need not discuss this issue.

■ X. Judicial sympathy is a commendable quality but in an action founded in tort we do not believe it has ever stood so alone in support of recovery of damages.

In Smith v. Sanborn State Bank, 147 Iowa 640, 644, 126 N.W. 779, 781, 30 L.R.A., N.S., 517, this appears:

" * * * To so hold would be to open the door to a ruinous flood of litigation. Occasions will arise when it would seem that such a recovery is demanded in the interests of justice, but it is better that the exceptional wrong should sometimes go unrequited than to abrogate a rule which in the vast majority of cases has a salutary effect. * * *"

As Harvard Law Dean Griswold has said, "The law and the public are poorly served when the Court judges a case to bring on a result it seeks."

The case is reversed and remanded with instructions to enter judgment for defendants.

Reversed and remanded.

LARSON, MOORE, STUART and Le-GRAND, JJ., concur.

RAWLINGS, J., GARFIELD, C. J., and MASON and BECKER, JJ., dissent.

RAWLINGS, Justice (dissenting).

It is impossible for me to agree with the reasoning set forth or conclusions reached by the majority in this case, particularly with reference to the matter of liability on the part of defendant Swenson. I therefore have no choice but to dissent.

Certain established principles which should govern appellate review in cases of this nature are:

(1) The trial court's findings of fact have the standing of a special verdict equivalent to that of a jury and will not be disturbed if supported by substantial evidence. Also, we view all evidence presented in that light most favorable to the judgment of the trial court, in this case most favorably to plaintiff. Rule 344(f)(1), R.C.P.; Dailey v. Holiday Distributing Corporation, Iowa, 151 N.W.2d 477, 483; and Marean v. Petersen, 259 Iowa 557, 144 N.W.2d 906, 909.

(2) Generally, questions of negligence, contributory negligence and proximate cause are for the jury (trier of the facts); it is only in exceptional cases that they may be decided as matters of law. Rule 344(f)(10), R.C.P.

(3) Credibility of the witnesses and weight to be given their testimony should here rest with the trial court, not with us. Verschoor v. Miller, 259 Iowa 170, 143 N.W.2d 385, 389.

The factual situation as described by the majority is substantially correct, but the findings based on those facts, adverse to plaintiff, are for the most part, in my humble opinion, either without foundation or a de novo substitute for those reached by the trier of the facts.

Illustrative is the statement made in the majority opinion to the effect that at time of accident the wagon was about one-fourth unloaded, and if so it was not overloaded at time of the accident. I submit this is a suppositional conclusion not borne out by the record.

Actually the evidence discloses the wagons here concerned are equipped with a steel cleated belt-like apron at the bottom which moves the load of silage forward to where it is engaged by the beaters.

This factually means the load normally moves forward en masse, neither feeding off the top nor the bottom. As a result, an overloaded wagon remains so from start to finish.

Also, on this matter of overloading, the record reveals plaintiff testified defendant Swenson, after the accident, twice admitted it was his fault because he had overloaded the wagons. The trier of the facts apparently accepted that statement as true.

Throwing some additional light on this subject, the discovery deposition of defendant Evenson, received in evidence, discloses that in his opinion the size of the loads would be called overloading. He also said overloading has a tendency to throw excess silage down on the conveyor or over the outside of the box, excess silage thrown on the conveyor can plug up the conveyor belt, and under these circumstances the conveyor belt would still operate but the silage would just stick in there.

The record also reveals defendant Swenson, working in the field, decided when the wagons were filled. However, as a witness he denies the wagons were overloaded, could not recall any complaints made by plaintiff, and does not believe he ever said the accident was his fault.

The trial court found plaintiff to be a truthful person, one who would not deviate from the truth in the slightest degree to serve his own purpose, and accorded a great deal of weight and credence to his testimony. Apparently the majority does not entirely agree.

I. One of the real issues presented in plaintiff's action against Swenson, his employer, is whether overloading the wagons was a proximate cause of the accident.

By his answer Swenson denies any overloading. As affirmative defenses he asserts plaintiff assumed risk of danger in attempting to clean silage from the conveyor mechanism while in operation, and was contributorially negligent. The burden of proof was upon Swenson to prove these defenses by a preponderance of the evidence. See rule 344(f)(5), (6), R.C.P., and Erickson v. Erickson, 250 Iowa 491, 495–499, 94 N.W.2d 728.

The trial court found Swenson failed to meet this burden. The majority now holds otherwise.

Although the case of Frederick v. Goff, 251 Iowa 290, 100 N.W.2d 624, involved defective machinery, the principles of law there expressed are here applicable and in large part determinative. For that reason I shall quote extensively from the cited case, referring to it occasionally as Frederick.

II. Dealing with the matter of assumption of risk this court said in Frederick, supra, loc. cit., 251 Iowa 296, 100 N.W.2d 628: "* * * we think assumption of risk does not appear as a matter of law and it was proper to submit this issue to the jury. It is an affirmative defense and the burden to prove it rested upon defendant. Erickson v. Erickson, 250 Iowa 491, 498, 94 N.W.2d 728, 732, and citations; Jackson v. Chicago, M., St. P. & P. R. Co., 238 Iowa 1253, 1261, 30 N.W.2d 97, 102, and citations. It is seldom a party who has the burden on such an issue establishes it as a matter of law. Jackson case and citations; Ruble v. Carr, 244 Iowa 990, 993, 994, 59 N.W.2d 228, 230, 231, and citations.

"If defendant was negligent in the respect alleged plaintiff did not assume the risk of injury therefrom by continuing in the work unless in the usual and ordinary course of his employment it was his duty to repair the equipment or remedy the defect therein, and even if such were his duty, he assumed no risk therefrom unless the danger from its use was imminent so a reasonably prudent person would not continue in the work. Section 88.14, Code, 1958, I.C.A., quoted in Erickson v. Erickson, supra, at page 501 of 250 Iowa, page 733 of 94 N.W. 2d, as construed by the Erickson decision and others therein cited, so provides. Johnson v. Kinney, 232 Iowa 1016, 1020, 7 N.W.

2d 188, 191, 144 A.L.R. 997, 1001, and citations. This statute states it is not to be construed to include risks incident to the employment."

Assumption of risk not only presupposes some danger but a reasonable opportunity to ascertain the nature of the risk and an appreciation of that risk. See Marean v. Petersen, 259 Iowa 557, 144 N.W.2d 906, 912–913; Pierce v. United States, D.C., 142 F.Supp. 721, 727, Aff'd., 235 F.2d 466; Restatement, Second, Torts, section 496D; and Prosser, Law of Torts, Hornbook Series, Third Ed., pages 461–468.

Factually the record discloses that when plaintiff first realized Evenson was not going to help unload, the latter was 20–30 rods away, the machinery was making considerable noise, and neither Swenson nor anyone else was available to whom he could report or turn for help. Furthermore, Evenson had been gone only about three minutes before the accident occurred.

I am satisfied assumption of risk is not shown here as a matter of law. By the same token it cannot logically be said the trial court erred in concluding, as trier of the facts, this defense was not established by the requisite degree of proof. See rule 344(f)(5), (6), (10), R.C.P., and Oltmanns v. Driver, 252 Iowa 1066, 1074, 109 N.W.2d 446.

III. Neither is it apparent to me, as a matter of law, plaintiff was contributorially negligent or that the trial court erred in concluding the evidence failed to support this affirmative defense. Reference is again made to rule 344(f)(5), (6), (10), R.C.P.

Section 463, Restatement, Second, Torts, defines contributory negligence as, " * * * conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm." See also Marean v. Petersen, 259 Iowa 557, 144

N.W.2d 906, 912, and Cronk v. Iowa Power & Light Co., 258 Iowa 603, 614, 138 N.W.2d 843.

Of course, since we are here dealing with an action by an employee against his employer contributory negligence, if established, goes only to mitigation of damages and would in no event bar the employee's right of recovery. Rule 97, R.C.P.

On that point, Frederick, supra, loc. cit., 251 Iowa 297–298, 100 N.W.2d 629 states: "Since this is an action by an employee against an employer to recover for negligence plaintiff was not required to plead or prove his freedom from contributory negligence but defendant might plead and prove contributory negligence in mitigation of damages. Rule 97, Rules of Civil Procedure, 58 I.C.A., Erickson v. Erickson, supra, 250 Iowa 491, 495, 496, 94 N.W.2d 728, 730, and citations. Defendant's answer alleges the injury was caused, or contributed to, by plaintiff's negligence. The trial court submitted to the jury the issue of plaintiff's contributory negligence in mitigation of damages. This was proper. Johnson v. Kinney, supra, 232 Iowa 1016, 1020, 7 N.W. 2d 188, 191, 144 A.L.R. 997, 1002, and citations."

The trial court found, as a fact, plaintiff was not contributorially negligent. With this finding we should not interfere.

IV. In so determining the issue of contributory negligence I am not unmindful of the fact a relatively small metal plate affixed to the subject chuck wagon provided in part:

"BE CAREFUL

1. * * *

2. * * *

3. When mechanism becomes clogged disconnect power before cleaning.

4. * * *

5. * * * "

But this alone should not serve to preclude recovery in the instant case.

Ordinarily, in order to be sufficient, a warning or instruction should be so plain or explicit the servant will understand and appreciate the danger, know how to avoid it by the exercise of reasonable care, and where extraordinary risks may be encountered the servant should be warned of their character and extent as soon as possible. A mere general warning of dangers to be encountered by the servant is not sufficient, and an insufficient warning is in legal effect no warning at all. A warning or instruction as to certain dangers is not sufficient to put the servant on notice as to other danger or varying perils. See Oklahoma Natural Gas Co. v. Walker, Okl., 269 P.2d 327, 331–332; Beaumont, S. L. & W. Ry. Co. v. Schmidt, 123 Tex. 580, 72 S.W.2d 899, 902; Sadler v. Lynch, 192 Va. 344, 64 S.E.2d 664, 666; and 56 C.J.S. Master and Servant § 290, page 1052. And see Schilling v. Roux Distributing Co., 240 Minn. 71, 59 N.W.2d 907, 917–918, and Blue v. Drackett Products Co., Fla. App., 143 So.2d 897, 899.

The record affirmatively reveals plaintiff did not attempt to physically clean the mechanisn. As disclosed infra, he reacted to the stimulus of the moment and rather than attempt to clean out material clogged in the mechanism or box, pushed down on the protruding fodder under an apparent impression the machine itself would then start movement of the silage and effect a self-cleaning process. This it did with the result plaintiff's right hand was caught in the machinery.

Admittedly an employer is under no duty to warn an employee of obvious dangers, hazards which should be reasonably appreciated, matters of common knowledge, or operation of natural forces in the performance of simple tasks. See Anderson v. Sheuerman, 232 Iowa 705, 710, 6 N.W.2d 125.

But here it cannot be said, as a matter of law, the danger was obvious, and in any event any peril existing was not attendant upon performance of a simple task.

A warning must be fair and adequate to the end a user, by exercise of reasonable care, is fairly and adequately notified of possible consequences attending the use of a given product or instrumentality.

Furthermore, presence of an ambiguous or uncertain warning by master to servant, like negligence, proximate cause and contributory negligence, is ordinarily an issue determinable by the trier of the facts. See rule 344(f) (10), R.C.P.; McGee v. Clearwater Mfg. Co., 214 S.C. 495, 53 S.E.2d 393, 395; and Hyland Hall and Co. v. Madison Gas and Elect. Co., 11 Wis.2d 238, 105 N.W.2d 305, 310.

In the instant case the warning plate affixed to the wagon by the manufacturer, upon which Swenson apparently relies, was not as a matter of law so clear and certain as to include the danger consequent upon mere pressure on silage protruding from the conveyer box. Under these conditions the matter of notice or warning was a matter determinable by the trial court. It should not be factually resolved by us on appeal.

Implied in the findings of fact and conclusions of the trial court is a finding the warning by the manufacturer, relied on by Swenson as aforesaid, was not so reasonably plain and explicit as to put plaintiff on notice of any danger attendant upon pressing down on the silage which protruded from the clogged conveyer box.

I submit, under the circumstances we are bound by this inherent finding.

V. Also, in my opinion, the trial court's conclusion that negligence of Swenson in overloading the wagons was a proximate cause of the accident and plaintiff's resultant injury, is both legally proper and supported by substantial evidence.

Of course, negligence itself is irrelevant in the absence of some causal connection between it and the injury.

In Frederick, supra, loc. cit., 251 Iowa 298–299, 100 N.W.2d 629, we stated on the matter of proximate cause:

"In considering the causal relation necessary to responsibility for negligence the general rules are set out in Restatement, Torts, sections 430 to 435. Christensen v. Sheldon, 245 Iowa 674, 682, 63 N.W.2d 892, 897, 48 A.L.R.2d 522.

"Section 431 of the Restatement says: 'The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.'

"We have used this language quite similar to that just quoted: 'Nor will the fact that some other cause operates with the defendant's negligence to produce the injury relieve the defendant if the injurious result is traceable *in some material degree* to his want of due care [citations].' (Emphasis added.) Swaim v. Chicago, R. I. & P. Ry. Co., supra, 187 Iowa 466, 471, 174 N.W. 384, 386, certiorari denied 252 U.S. 577, 40 S.Ct. 344, 64 L.Ed. 725. In considering the issue of proximate cause we have frequently cited the Swaim case with approval.

"Section 435, Restatement, Torts, provides: *'If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.'* (Emphasis supplied.)

"Much the same thought is expressed in many of our opinions. Priebe v. Kossuth County Agricultural Ass'n., Inc., 251 Iowa 93, 100, 99 N.W.2d 292, 296, in referring to actionable negligence, states 'it is not necessary that defendant could have foreseen the particular injury that resulted provided it should have foreseen its omission to act would probably result in injury of some kind to some person [citations].' To

like effect is Chenoweth v. Flynn, 251 Iowa 11, 16, 99 N.W.2d 310, 313; Gray v. City of Des Moines, 221 Iowa 596, 599, 265 N.W. 612, 613, 104 A.L.R. 1228, 1230; Godbey v. Grinnell Electric & Heating Co., 190 Iowa 1068, 1076, 181 N.W. 498, and citations. * * *

"Section 443 of the Restatement expresses the rule on which plaintiff places special reliance:

" *'An intervening act of a human being or animal which is a normal response to the stimulus of a situation created by the actor's negligent conduct, is not a superseding cause of harm to another which the actor's conduct is a substantial factor in bringing about.* (Emphasis supplied.)

" 'Comment: a. The rule stated in this Section applies * * * to acts done by the person who is harmed * * *. It is not necessary that an act which is done by the person harmed or by a third person should be "reasonable"; that is, that the act should be one which a reasonable man would regard as not involving an unreasonable risk to himself or others. * * * If it be done by the person who is harmed and is unreasonable in the sense above stated, it may amount to contributory negligence which as such prevents him from recovering (see section 467), but the actor's negligent conduct is none the less the legal cause of the harm. * * *.'

"Comment b under section 443 further clarifies what has just been quoted. To like effect are section 447(c) and Comment h thereunder.

"We find little dissent from recognition by the courts of the rule expressed in section 443, Restatement, Torts. We are not persuaded we should disagree with it. The rule appears to be applicable here and to support submission to the jury of the issue of proximate cause." See also Restatement, Second, Torts, sections 440–443 and 447.

In the case at hand Swenson alone determined when the wagons were ready to be

hauled to the silo. And reasonable minds could conclude clogging of the conveyer box was traceable in some material degree and attendant to lack of due care by this defendant in overloading.

As previously indicated, the fact that Swenson may not have foreseen the specific harm which could and did result does not negate the fact that overloading was a substantial factor in bringing about the injury which ultimately resulted to plaintiff.

And, as heretofore disclosed, *the consequence of a negligent act need not be foreseen, it being sufficient if the injuries resulting are the natural, though not a necessary or inevitable result of the wrong.*

In the instant case the evidence created a jury issue as to proximate cause which was resolved adverse to defendant Swenson by the trier of the facts. Under the circumstances this determination should be binding upon us. See rule 344(f) (10), R.C.P.; Cronk v. Iowa Power & Light Co., supra, loc. cit., 258 Iowa 613, 138 N.W.2d 843; Lockwood v. Wiltgen, 251 Iowa 484, 489–491, 101 N.W.2d 724; Chenoweth v. Flynn, 251 Iowa 11, 16–18, 99 N.W.2d 310; Bell v. Brown, 214 Iowa 370, 377, 239 N.W. 785; and Prosser, Law of Torts, Hornbook Series, Third Ed., pages 290–291.

VI. The majority, as heretofore stated, factually determines plaintiff put his arm in the beater area. This view apparently stems from Swenson's claim the plaintiff was injured in a manner physically impossible under the evidence. In taking that position he attempts to invoke the physical fact rule.

This contention appears to be based on the theory the trial court inferentially found plaintiff did not voluntarily place his hand and arm into the conveyer box where the beaters are located. Seemingly Swenson argues the physical facts disclose otherwise.

At the outset I am persuaded the physical fact rule, even if applicable, is of no benefit to this defendant.

In Stevens v. Gear, 240 Iowa 1348, 1353, 39 N.W.2d 408, 412, this court said: "The 'physical fact rule' is well-established and sound. But it applies 'only where the existence of such facts and their connection with the question at issue, is established or admitted; and proof of such nature cannot be construed to establish a particular conclusion as a matter of law *unless the facts and circumstances lead to but one conclusion to the exclusion of all others.*' 32 C.J.S. Evidence § 1031, page 1074." (Emphasis supplied.)

Repetition of the evidence as to plaintiff's actions immediately prior to the accident is unnecessary. Briefly stated it does not disclose, as a matter of law, plaintiff did anything other than as he testified, and the facts do not unavoidably lead to a conclusion, to the exclusion of all others, he placed his hand in the mechanism or conveyer box.

It is just as reasonable to assume his pressing down on the protruding silage caused that located inside the enclosure to be loosened thereby freeing the beaters which then, pushing downward, created a pulling force on the protruding material akin to a suction action, which in turn caused the silage plaintiff was pressing upon to be pulled momentarily inward, taking with it plaintiff's hand and arm.

Nothing disclosed in the record makes plaintiff's version of the accident impossible or improbable. Neither does it serve to make the trial court's conclusions on this subject erroneous.

VII. No apparent useful purpose will be served by engaging in an extended discussion of the majority opinion holding defendants Juveland and Evenson not liable as a matter of law.

I would affirm, at least as to the judgment entered against defendant Swenson.

GARFIELD, C. J., and MASON and BECKER, JJ., join in this dissent.